ATTORNEY GENERAL, *ex rel.* McRAE, *v.* THOMPSON.

DETROIT LIBRARY COMMISSION *v.* HEINEMAN.

1. CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS—HOME RULE
   ACT — DETROIT CHARTER — LIMITATION OF INDEBTEDNESS —
   SPECIAL ACT—LOCAL LEGISLATION.
   Act No. 302, Local Acts 1911, amending the existing charter
   of the city of Detroit by extending the limit of municipal
   indebtedness from two to three per cent. of the assessed val-
   uation, is invalid: under the Constitution the charter may
   only be amended by general revision, and the statute, being
   a local act, is in excess of the legislative authority, since a
   general act could be made applicable. Const. art. 5, § 30.

2. SCHOOLS AND SCHOOL DISTRICTS—LIBRARIES—CITIES — DETROIT
   LIBRARY COMMISSION.
   Free public libraries are within the proper range of school ap-
   paratus and are supplemental to, and a part of, the educa-
   tional system of the State.

3. SAME—SCHOOL BOARDS—MUNICIPAL CORPORATIONS.
   School boards are separate and distinct municipal corporations
   and State agencies.

4. SAME—EDUCATION—FINANCE.
   Education in Michigan is not a part of the local self-govern-
   ment inherent in the townships or municipalities except in
   so far as the legislature may choose to make it so.

5. SAME—CONSTITUTIONAL LAW—CITIES.
   It was the intent of the Constitution to separate the school
   organization from the general municipal government.

6. SAME.
   Though municipal corporations, organized for the same pur-
   poses, with like powers and duties, cannot exist in the same
   territory, those having different purposes, rights, and duties
   may, and often do, occupy the same territory.

7. SAME—STATUTORY CONSTRUCTION—CHARTERS.
   Construing the provisions of the Detroit charter limiting the
   municipal indebtedness, in connection with the evident pur-
   poses of the legislature, with the other provisions of the

instrument and with reference to the title, which omits any reference to the educational system, the limitation applies only to the indebtedness for general municipal purposes.[1]

8. SAME.
   The application of particular provisions is not to be extended beyond the general scope of a statute unless such extension is manifestly designed.

9. SAME.
   Taxes and bonds for school and educational purposes are not for city and municipal purposes.

Appeal from Wayne; Hosmer, J. Submitted January 30, 1912. (Calendar No. 24,990.) Decided February 16, 1912.

Bill by Franz C. Kuhn, attorney general of the State of Michigan, on the relation of Milton A. McRae, against William B. Thompson, mayor of the city of Detroit, and others, to restrain the issuance of library, sewer, school, and waterworks bonds duly authorized. From a decree for complainant, defendants appeal. This cause was consolidated with the mandamus proceedings above mentioned in the Supreme Court and both were argued and submitted as one cause. Reversed.

Certiorari to Wayne; Hosmer, J. Submitted January 30, 1912. (Calendar No. 24,985.) Decided February 16, 1912.

Mandamus by the Detroit library commission, the board of education of the city of Detroit, and the board of health of said city, by separate petitions against David E. Heineman, city controller, to compel respondent to issue bonds duly authorized at a special election and by the common council. The proceedings were heard as one case by the circuit court by which the writ was denied. Reversed.

---

[1] What constitutes an "indebtedness" within meaning of constitutional and statutory restrictions of indebtedness of municipal corporations, see note in 23 L. R. A. 402.

In chancery case:  *Franz C. Kuhn,* Attorney General (*Fred A. Baker,* of counsel), for complainant.

*Richard I. Lawson,* for defendants.

In second case:  *Divie E. Duffield,* for appellant Detroit library commission.

*Edmund Atkinson,* for appellant board of education.

*Fred A. Baker,* for appellant board of health.

*Richard I. Lawson* and *David E. Heineman,* for appellee.

STEERE, J.  These proceedings have been equitably consolidated by common consent and, by permission of the court, argued and submitted together.  They involve the validity of certain proposed bond issues of the city of Detroit.  Said proposed issues, delayed by and directly involved in this contention, are:  Sewer bonds, $730,000; school bonds, $656,000; library bonds, $216,000; waterworks bonds, $250,000.  They were authorized by popular vote, action of the city council and board of estimates, and all proceedings leading up to their issue have been cared for by skilled counsel and appear regular.  It is not necessary to review those details here, as no question is raised against their validity except the general limit on the city's indebtedness.

The case of *Attorney General, ex rel. McRae,* v. *Thompson,* was recently before this court (167 Mich. 507 [133 N. W. 532]).  The information then averred that the bonds in question were valid, and certain of the defendants were publicly proclaiming their invalidity.  It prayed that the court pass upon, and certify to the legality of, these bonds, and restrain defendants from further asserting to the contrary.  Twelve propositions which are set out in the opinion referred to were propounded to the court for consideration.  Answers were filed by three of the defendants asserting the validity of the bonds they represented and joining in the prayer that all questions touching the legal-

168 MICH.—33.

ity of the budget and the bond issues be definitely determined. Other defendants demurred to the information "because it does not show a legal injury." The trial court held it had "no jurisdiction to render an opinion upon the twelve questions asked" and sustained the demurrer, dismissing the information. In the form the matter was then presented, the action of the trial court was sustained by this court; it being the opinion that the questions were purely academic, there being in the information "a mere statement of the proceedings taken to issue said bonds and the importance of a determination of their validity, without any averment of illegality in the proceedings or breach of any official duty." Following this opinion, after the record was remanded, the information was amended, by permission of the court; the general demurrer being allowed to stand as originally filed, and the matter was again submitted to the court below. The amendment was in part as follows:

"To make this information intelligible and to invoke the jurisdiction of the court to declare said tax levy and bond issues legal or illegal, the attorney general, on the relation aforesaid, gives the court to understand and be informed that said proposed bond issues and each of them are excessive and illegal, including the water bonds prepared to be issued by the board of commissioners.

"(10) That the said bond issues, so far as they are found excessive and beyond the limits fixed by charter or law or are otherwise illegal, may be declared invalid, and that the city of Detroit, the common council, the city controller and the board of water commissioners may be enjoined from selling or in any way negotiating a sale of said bonds."

The circuit court held most of the proposed bond issues to be illegal for the reason that they were in excess of the 2 per cent. limit of indebtedness fixed by law, and granted an injunction restraining their sale except in so far as they are now authorized to the amount of $120,000 found to be within the limit. From this relator appealed. In this appeal a brief has been filed and argument made in sup-

port of the bonds proposed to be issued by the board of water commissioners.

In the meantime the Detroit library commission, the board of education, and the board of health of the city of Detroit, in separate suits, petitioned the circuit court of Wayne county for writs of mandamus to compel the respondent David E. Heineman, city controller, to advertise and sell their respective bonds, which had been authorized by the electors, common council, and board of estimates, under regular proceedings taken according to law; said respondent having declined to do so under advice obtained from the corporation counsel. So-called answers, amounting in effect to demurrers, admitting the facts but denying the legal conclusions, were filed. The three petitions were then by stipulation and order of the court merged and submitted together as one proceeding. The trial court again held the bond issues in excess of $120,000 illegal, for the reason that they would raise the bonded indebtedness of the city above the 2 per cent. limit. The proceedings were then removed to this court by writ of certiorari and the various entanglements which surround the proposed bond issues of the city of Detroit are now before this court. The vital question is whether or not the proposed issues swell the gross debt of the city of Detroit beyond the 2 per cent. limit based on the assessed valuation of its real and personal property to which it is restricted by the city charter and the so-called "home rule" act of 1909.

In support of the legality of said issues, it has been urged that the limit was raised by Act No. 302 of the Local Acts of 1911 to 3 per cent., which is not exceeded by the proposed increase of indebtedness. The constitutionality of said Act No. 302 being in doubt, it is further urged, in support of the various issues by their respective representatives, that the board of education of the city of Detroit and the Detroit library commission are distinct and independent corporations, for educational purposes only, created by acts of the legislature under its general powers to maintain and enforce a free school system

throughout the State; that said acts are not part of the charter of the city in the usual and legal meaning of the term; and that therefore their bonds should not be included in computing the bonded indebtedness of the city for municipal purposes.    This contention is relied upon by the board of health, which points out and urges that, if the school bonds and library bonds outstanding are not included in the gross indebtedness of the city, the 2 per cent. limit would not be exceeded by all the issues proposed; also urging that the bonds of the board of health are for necessary improvements to preserve and promote the public health.    On behalf of the board of water commissioners it is also asserted that it is an independent corporation, created by an act of the sovereign legislature of this State in its early history (1853); that its rights and duties are independent of municipal interference and well defined by the law creating the board, and subsequent amendments, which have been upheld in numerous decisions of this court.    It is also pointed out that its authority to bond comes by direct legislation, distinct from the city charter, for which reason its indebtedness is not to be included in the restriction placed by the charter on the amount to which the city is limited.

The important questions before us are:

*First,* the constitutionality of Act No. 302, Local Acts of 1911.

*Second,* Are the library board, board of education, and board of water commissioners independent corporations, distinct in character from the municipal corporation of the city of Detroit to the extent that the 2 per cent. limit does not apply to their bonds?

At the time of the adoption of the Constitution of 1909, the existing city charter of Detroit (section 7, chap. 11 [Act No. 326, Local Acts 1883]) limited the gross debt of the city to 2 per cent. of its assessed valuation.    The Constitution of 1850 authorized special legislation, or local acts, for the incorporation of cities.    This came to be regarded as objectionable and a growing evil, which the

Constitution of 1909 sought to remedy by the following provisions on the subject (art. 8):

"Sec. 20. The legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages; such general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts.

"Sec. 21. Under such general laws the electors of each city and village shall have power and authority to confirm, adopt and amend its charter, and, through its regularly constituted authority, pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this State."

Under this constitutional mandate the legislature of 1909 passed what is known as the "home rule" act. Act No. 279, Pub. Acts 1909. Being required by the Constitution to "restrict powers of borrowing money and contracting debts," the act fixed the limit at 8 per cent. of the assessed valuation, but provided that in cities where the amount of money which may be borrowed is now limited by law, such limit shall continue until it shall be raised or lowered by a two-thirds vote of the electors, and that each existing city should continue with all its present rights and powers until otherwise provided. By Act No. 302 of the Local Acts of 1911, it was sought to amend section 7 of chapter 11 of the Detroit city charter increasing the limit of indebtedness to 3 per cent. This palpable attempt to amend the charter in violation of the constitutional inhibition has no suggestion of justification beyond section 30 of article 5 of the Constitution, which provides:

"The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question."

Counsel do not now seriously contend that a genera lact could not be made applicable, and we have no hesitation

in holding that it could.    The law is clearly unconstitutional and void.

The limit of the gross debt of the city of Detroit for strictly municipal purposes was and is fixed by the charter at 2 per cent. of the assessed valuation, and under the Constitution and home rule act it can only be changed by a general revision of the city charter made pursuant to the provisions of the home rule act.

We then come to the question: Must the school and library bonds be included in computing and limiting the gross indebtedness of the city of Detroit as contemplated by its charter ?

With reference to the library and school bonds, the same laws and rules of construction apply.    The act incorporating the Detroit library commission provides that its commissioners shall be elected by the members of the board of education.    Both the Constitution of 1850 and the new Constitution of 1909 require the legislature to establish at least one library in each township and city. It is held that libraries are a recognized factor of civilization, a valuable instrumentality in education, that they enlarge and supplement the work of schools, are within the proper range of school apparatus, and free public libraries are supplemental to, and a part of the educational system of the State.    *Maynard* v. *Woodward*, 36 Mich. 423.

Early in the history of this country the foundation of our free school system was laid in the ordinance of 1787, providing fundamental laws for the region northwest of the Ohio river and setting it apart for future division into States.    Special emphasis was given to the subject of general education in the familiar declaration that religion, morality, and knowledge, being essential to good government and the happiness of mankind, " schools and the means of education shall be forever encouraged."    This language has been preserved and perpetuated in the Constitutions and statutes of our State, and our free school system has been organized, fostered, and supported by constitutional provisions and legislative enactment, as a

primary and distinctive function of State government held under State control. Its administration, however, has been committed in its details to local agencies of limited territory, designated district boards or boards of education, co-operating with, and more or less closely allied to, municipal corporations for local government which exist in the form of cities, villages, and townships covering the same territory; but the matter of universal and compulsory education, and the support of free schools to that end, has been held apart from the organization and maintenance of cities and villages for strictly local government and municipal conveniences.

The contention was early made that the general State policy is opposed to all connection between State and village government and school administration; but it was held that such was not the case, there being no natural antagonism or incongruity, though "strict regulations are necessary to prevent our city and village organizations from drawing to themselves the supervision of the common schools within their borders." *Hatheway* v. *Sackett*, 32 Mich. 97. The close relations existing between the educational system and general municipal system are discussed and various decisions upon that subject are reviewed by Justice CAMPBELL, in an opinion filed in *Belles* v. *Burr*, 76 Mich. 1 (43 N. W. 24). In that case the learned Justice was not in harmony with the majority on the main issue, which involved the right of a female guardian of a child included in the school census to vote at a school meeting, but we can profit by, and well indorse, that portion of his opinion wherein he notes a tendency in some of the decisions to so closely blend the two systems as to subordinate the school system to the position of a municipal adjunct or agency of the local government, and further points out that, by an amendment in 1879 of section 12 of article 13 of the Constitution. if there was any ambiguity before, now—

"City boards of education are as distinctly recognized

constitutional bodies as any other elective bodies. There is no city in the State where the board of education has not power to affect the property of nonresidents as well as of residents, by public burdens; and under the Constitution all powers of government must come from the electors made such by the Constitution itself. The board of city school authorities is a body having a larger control than township boards. It has all their powers, and more, and it is by the Constitution made the correlative body to the township board."

School boards have been uniformly held to be separate and distinct corporations. It has also been held that they are municipal corporations and State agencies. *Maynard* v. *Woodward, supra; Board of Education* v. *City of Detroit*, 30 Mich. 505; *School District* v. *Gage*, 39 Mich. 484 (33 Am. Rep. 421); *Tibbals* v. *Board of Education*, 39 Mich. 635; *Pingree* v. *Board of Education*, 99 Mich. 404 (58 N. W. 333); *Attorney General* v. *Lowrey*, 131 Mich. 639 (92 N. W. 289); *Attorney General* v. *Board of Education*, 154 Mich. 584 (118 N. W. 606). It was said by Justice COOLEY, in *Board of Education* v. *City of Detroit, supra:*

"And the board of education, though existing for purposes strictly public, is nevertheless a distinct corporation from the city, having its distinct property and funds, and entitled to demand for them the same protection which may be demanded by other corporations or individuals."

In *Attorney General* v. *Board of Education, supra*, this court said:

"Education in Michigan belongs to the State. It is no part of the local self-government inherent in the township or municipality except so far as the legislature may choose to make it such. The Constitution has turned the whole subject over to the legislature."

The question now is to what extent the legislature has chosen to make it such in the case under consideration.

The Constitution of 1909, like that of 1850, treats education and local government as distinct subjects, in separate articles independent of each other. Article 11 is devoted

to "Education," and article 8 to "Local Government." These separate articles impose on the legislature the duty of providing, in one instance for a free school system, and in the other for the organization of cities, villages, and other entities of local government for the convenient administration of local affairs. The home rule act, passed pursuant to the provisions of the new Constitution, simply keeps the city of Detroit, where it was under its former charter, subject to all its provisions and restrictions until proper steps have been taken in conformity with the act to revise the charter. Beyond that the construction of the act is unimportant here, except to note that the distinct entity of the school system is carefully observed by language of exclusion. Each city incorporated under that act is required to provide "for the levy, collection and return of State, county and *school taxes* in conformity with the general laws of the State." It is further provided that "the subjects of taxation for municipal purposes shall be the same as for the State, county and school purposes under the general law," thereby sharply distinguishing taxation for municipal purposes from taxation for school purposes. The intent to keep school organization distinct is further shown in the following language wherein a city is authorized to provide—

"For the establishment of any department that it may deem necessary for the general welfare of the city, and for the separate incorporation thereof: *Provided, however*, that these provisions shall not be construed to extend to public schools."

As to education and local government the new Constitution and the home rule act but follow the general scheme of former Constitutions and former acts, only emphasizing and more freely opening the way for local self-government. We therefore, in the light of this well-settled and long-continued policy of distinct school organization, must inquire whether the legislature, in enacting a charter for the city of Detroit under one article of the Constitution, intended that the restrictions placed

on indebtedness for municipal purposes should be extended beyond the subject of such article and control the finances of the public school system, another subject provided for in a different and distinct article.

The school district of Detroit is co-extensive in geographical limits with the city. Each is an independent public corporation. Public corporations organized for the same purpose, with the same rights, powers, and duties, could not exist in the same territory (*Scrafford* v. *Gladwin County Sup'rs*, 41 Mich. 647 [2 N. W. 904]); but where they are organized for different purposes, have different rights and duties relating to entirely distinct matters, they may and often do occupy the same territory, working in harmony each within the scope of its authority. In such cases the burden of maintenance falls, as a rule, on the same persons and property, and for such corporations to be so organized as to co-operate in the conduct of their several affairs and avoid duplication of agencies essential to each tends to economy and convenience. It is well settled that making a person an *ex officio* officer of one organization by virtue of his holding office in another does not tend to merge the two organizations. *People* v. *Edwards,* 9 Cal. 286; *People* v. *Ross,* 38 Cal. 76; *Hemingway* v. *Stansell,* 106 U. S. 399 (1 Sup. Ct. 473).

The school system of the city of Detroit was created by separate enactments under that article of the Constitution relating to education. Early provision was made by special legislation for a system of public schools in the city of Detroit. The present law, entitled "An act relative to free schools in the city of Detroit," approved February 24, 1869 (Act No. 233, Laws 1869), as amended, provides that the city of Detroit shall be considered one school district under the direction and regulation of the board of education, free to all children residing within the limits thereof between the ages of 5 and 25 inclusive. The members of the board of education are elected every alternate year when the judges of the Supreme Court are required to be elected. Votes cast for them are deposited

in separate ballot boxes from those used for other city officials. The school inspectors, together with the mayor, controller, and recorder of the city (who are declared to be *ex officio* school inspectors with a right to a seat at the meetings of the board but no power to vote) are a body corporate, known and distinguished by the name of the " Board of Education of the City of Detroit," and in that name have power to sue and be sued, hold and sell property, and transact such other business as the interests of the school require. Said board has full control over the school funds and authority to apply for and receive all moneys appropriated for primary schools and the Detroit library. Elaborate provision is made for the control and management of the school system, accumulation of property and erection of buildings necessary for school purposes, for hiring superintendents and teachers and other necessary employés, providing for retiring and pensioning superannuated teachers, and for all other things necessarily and naturally appertaining to the conduct of a large school system.

The act contains a scheme of finance and taxation which provides that the board of education shall transmit to the common council, through the city controller, each year an estimate of the amount of money which the board deems necessary for the proper maintenance of the public schools of the city during the fiscal year next ensuing, which estimate, so far as practicable, shall be made in detail. Said board is required at the same time to transmit such estimates as are deemed necessary for the purchase of lots, the erection and remodeling of school buildings, the purchase of necessary furniture, fixtures, etc. So much of these estimates as the common council and board of estimates of the city of Detroit approves is to be levied and collected "in addition to all other taxes authorized by law to be assessed in said city." The city treasurer is made the custodian of the moneys for the board of education, and is required to give bonds for the safe handling of the same. School taxes are to be put upon the roll of the city

in a separate column distinct from other city taxes.   The law also provides that every resolution or proceeding of the board of education, whereby any liability or *debt* may be created, etc., shall, before it takes effect, be presented by the secretary of the board to the mayor of the city of Detroit.   If he approves the same, said resolution goes into effect.   The law also provides that the common council, with the consent of the board of estimates, may cause the whole or any part of the appropriation for the purchase of lots and erection of school buildings to be made by issue of bonds in lieu of raising the same by taxation.   While certain of the city officials *ex officio* act for and with the board of education in carrying out its scheme of finance, all these provisions are separate and distinct from any provisions in the city charter, which deals with strictly municipal expenses and indebtedness.   While the mayor and common council of the city have a restraining control over the estimates made by the school board and may reduce the same, even though the charter limit of 2 per cent. is not reached, it may be regarded as a discretionary power, conferred by the school act for the common interest, to harmonize and balance expenditures between two coextensive and co-ordinate corporations of the same territory supported by the same community.

The limit of indebtedness under consideration is found in section 7, chap. 11, of the Detroit charter, and provides that—

"The gross debt of the city after deducting the means in the sinking fund of said city and not including the water debt, shall never exceed two per cent. of the assessed value of all the real and personal property in said city."

By section 11 of the same chapter it is declared:

"The common council shall not have authority, except as herein specially provided, to borrow any sums of money whatsoever on the credit of the corporation."

By section 14 of the same chapter it is provided:

"All bonds and evidences of debt issued, and all contracts made or entered into contrary to or not authorized by the provisions of this act shall be absolutely void."

Culling out these limitations and taking them literally, giving the words general application and their "natural and ordinary meaning" as such, no money could be raised in the city of Detroit for educational purposes either by taxation or bonds. Manifestly such was not the intent. Such language must be interpreted, and its meaning ascertained, not only from the words used, but the subject-matter to which they relate, and in the light of other provisions of the charter and other laws in existence at the time.

The purpose of a statute must be indicated by its title. The title of the charter of the city of Detroit gives no notice that the educational system is involved. It makes no provision for it.

"The application of particular provisions is not to be extended beyond the general scope of a statute unless such extension is manifestly designed. Legislatures, like courts, must be considered as using expressions concerning the thing they have in hand; and it would not be a fair method of interpretation to apply their words to subjects not within their consideration, and which, if thought of, would have been more particularly and carefully disposed of." *Estate of Ticknor,* 13 Mich. 44.

It is a rule of construction that the meaning of the legislature is to be obtained from the subject-matter being dealt with, as well as the meaning of the words used, and the words used are to be limited to the object the legislature intended to apply them to. *Lessee of Brewer* v. *Blougher,* 14 Pet. (U. S.) 178; *United States* v. *Palmer,* 3 Wheat. (U S ) 610.

We think fair rules of construction limit the phrase "gross debt of the city of Detroit," found in the charter provisions relating to taxation and finance, to the specific object which the legislature had in mind, which was the power of the city authorities to incur indebtedness for

strictly municipal purposes and activities, and not a limitation on one of the sovereign powers of the State of general jurisdiction and application. Taxes and bonds for school and educational purposes are not for city or municipal purposes. The legislature, enacting a comprehensive scheme of local government for a large and rapidly growing city, omitted absolutely from its charter any provision for the maintenance of the public schools and wholly ignored the subject. We must conclude this was intentional, done with the knowledge that other laws controlled the subject of education and other provisions had been and would be made for financial support of the school system; hence the charter was confined strictly to "local government," to the exclusion of "education," and the limit of indebtedness was directed strictly to expenditures for local government, its necessities and conveniences.

We think this case distinguishable from those decisions in other States where, under other statutes, certain indebtedness for school purposes has been aggregated with that for city purposes to determine the debt limit as fixed by comprehensive, constitutional provisions of general application, which declare that no political or municipal corporation shall become indebted in any manner for any purpose to any amount in the aggregate exceeding a certain sum. Here a city charter, dealing with a particular subject, fixes a limit as to that subject.

Guided by the foregoing considerations, we are constrained to hold that the school bonds and library bonds of the city of Detroit were not intended to be, and are not, included in the 2 per cent. limit of indebtedness for municipal purposes specified in the charter

As these conclusions relieve the other bonds involved in this controversy from the imputation of exceeding the debt limit, the special questions relating to them become unimportant and need not be further considered.

Judgment is reversed, and the proceedings are remand-

ed for such further action as may be necessary in the premises under this opinion.

MOORE, C. J., and BROOKE, BLAIR, and STONE, JJ., concurred.

MCALVAY, OSTRANDER, and BIRD, JJ., did not sit.