STATE ex rel. LYNDON A. SMITH v. CITY OF ST. PAUL and Others.[1]

December 24, 1914.

Nos. 19,056—(19).

**City of St. Paul — commission charter sustained.**

> The Commission Charter of the city of St. Paul, adopted in 1912, sustained as against the contention that, by reason of its educational features, its adoption, solely by the male voters or otherwise, was not authorized by Const. art. 4, § 36, relating to home-rule charters, and that such provisions contravene Const. art. 8, §§ 1, 3, relating to establishment and maintenance of public schools, and, both in themselves and in the manner of their adoption, violate article 7, § 8, enfranchising women in educational matters.

Upon the relation of Lyndon A. Smith, as Attorney General, this court issued its writ directed to the city of St. Paul, Winn Powers, S. A. Farnsworth, O. E. Keller, Henry McColl, Anthony Yoerg, M. N. Goss, J. J. O'Leary and W. C. Handy, to show cause *quo warranto* they claimed to exercise any authority in matters pertaining to schools and libraries in that city. Writ quashed.

*Lyndon A. Smith,* Attorney General, *Marcus D. Munn, Charles E. Otis, Francis B. Tiffany, W. H. Yardley, John F. Fitzpatrick,*

---

[1] Reported in 150 N. W. 389.

*Frederick G. Ingersoll, Charles Bechhoefer, William G. Graves* and *Gustavus Loevinger,* for relator.

*O. H. O'Neill* and *John W. Bennett,* for respondents.

PHILIP E. BROWN, J.

This is a *quo warranto* proceeding commenced in this court on information of the attorney general, to test the constitutionality of certain provisions of the present Commission Charter of the city of St. Paul, and the individual respondents' right to exercise authority over its public schools and libraries. Respondents moved to quash.

The facts set out in the petition and writ will be accepted as true, and are as follows: The city has been a municipal corporation for more than 50 years. In 1900 it adopted, pursuant to Const. art. 4, § 36, a Home Rule Charter, which in terms included and adopted the provisions of Sp. Laws 1891, p. 268, c. 36, as amended, whereby the city was organized and incorporated as a special school district with the usual statutory powers, to be administered by seven school inspectors appointed by the mayor and authorized to exercise all the powers vested thereby or by any general law in any school district or in the city considered as a separate and independent one; and thereafter the special district thus created was so administered until the city's Commission Charter became effective. Similarly, up to that time, the city's library system, under the Home Rule Charter, was under the control of a board of directors appointed by the mayor, with authority to manage and supervise all public libraries, reading rooms, etc., and all property acquired for such use, and power, subject to other provisions of the charter, to control and expend all moneys received for such purposes. In 1912 the Commission Charter, which contained no provision concerning voting by women, was proposed, by way of an amendment to the Home Rule Charter, by petition of male voters, and was submitted to and adopted by the male electors at an election held for that purpose and at which women were not allowed to vote. This amendment attempted to substitute, in lieu of the special law of 1891, a different plan as to the management and control of public schools and libraries and the affairs of the school district, by placing them in control of the mayor and six

councilmen, one of which latter was to be known as the Commissioner of Education, with the duty and power of establishing, controlling, maintaining and providing for such schools, the public school system, and the general educational interests of the city as a special school district, and of managing and controlling the property of the city used for educational purposes, with like control of its libraries, together with all property set apart for their use or maintenance and the expenditure of moneys in connection therewith. It is claimed that under the last charter women are in effect denied the right to vote for school and library boards, and are ineligible to hold office pertaining to the management of schools and libraries. The amendment became effective, if ever, in June, 1914, and, all the offices held by respondents being thereby made elective, respondent Powers was chosen mayor, Handy comptroller, and the others councilmen, at an election held thereunder. Thereafter they qualified and entered upon the performance of their respective duties, which they have since continued to perform, with Councilman Yoerg acting in the capacity of Commissioner of Education in accordance with the Commission Charter, to which position he was duly appointed by the mayor.

The provisions of the Home Rule Charter concerning the schools and libraries of the municipal school district, relator claims, have not been superseded by those of the Commission Charter relating to the same subjects, and the former and not the latter are in force in these regards. These contentions are based on the proposition that the provisions of the Commission Charter relating to schools and libraries variously violate our Constitution; and thus manifestly the whole controversy turns upon an answer to the question whether there was lawful right in the male electors only, to substitute the plan of controlling St. Paul as a special school district and its libraries, embraced in the Commission Charter, for that established by Sp. Laws 1891; p. 268, c. 36; relator's insistence being that the former violates Const. art. 8, §§ 1, 3; art. 4, § 36; and art. 7, § 8.

1. Sections one and three of article 8 are as follows:

"The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the

legislature to establish a general and uniform system of public schools."

"The legislature shall make such provisions, by taxation or otherwise, as, with the income arising from the school fund, will secure a thorough and efficient system of public schools in each township of the state."

These provisions were not grants of power, this being inherent, but are mandates prescribing the specified duty. Associated Schools of I. D. No. 63 of Hector v. School District No. 83 of Renville County, 122 Minn. 254, 142 N. W. 325, 47 L.R.A.(N.S.) 200. With us maintenance of public schools has always been a matter of state as distinguished from local concern. As has well been said in a recent decision, education "is not a part of the local self government inherent in the township or municipality, except so far as the legislature may choose to make it such. The Constitution has turned the whole subject over to the legislature." Kuhn v. Thompson, 168 Mich. 511, 134 N. W. 722. In order, however, to effectuate the constitutional mandates, quoted above, and in pursuance of a settled public policy, the law-making body has, because itself unable to perform these duties directly, provided for common, independent and special school districts, all of which are usually public corporations; the two former being governed by general laws, and the latter by the special laws creating them, except as these are modified by general laws. The legality of these special districts is settled by a line of decisions commencing with Board of Education of Town of Sauk Centre v. Moore, 17 Minn. 391 (412), wherein it was held that the establishment of such districts by legislative acts did not contravene the uniformity clause of the Constitution. Nor can it be questioned. They are recognized as legal in all the cases about to be cited, and also in State v. Henderson, 97 Minn. 369, 106 N. W. 348, and in Curryer v. Merrill, 25 Minn. 1, 33 Am. Rep. 450, wherein it was claimed that the same rules applicable to ordinary common schools and districts in respect to text books had to be applied to independent and special districts. The court said at page 6:

"The rule of uniformity contemplated by this constitutional provision which the legislature is required to observe, has reference to

the system which it may provide, and not to the district organizations that may be established under it. These may differ in respect to size, grade, corporate powers and franchises, as may seem to the legislature best, under different circumstances and conditions; but the principle of uniformity is not violated, if the system which is adopted is made to have a general and uniform application to the entire state, so that the same grade or class of public schools may be enjoyed by all localities similarly situated, and having the requisite conditions for that particular class or grade."

Several of these special districts are directly identified by statute with municipalities, and are administered in connection with their affairs. One of such was involved in City of Winona v. School District, No. 82, Winona County, 40 Minn. 13, 41 N. W. 539. By special law the territory within the corporate limits of the city of Winona was constituted one school district for the regulation and management of its schools, under the direction and control of a board whose members were to be elected at the charter election, two for each ward, and one for the city at large, to constitute the "board of education of the city of Winona." The city council was required to approve and ratify every contract made by the board for the purchase of a school-house site, and the board was required to submit to the city council annually an estimate of the necessary sums to defray the expenses of the schools, which was subject to the latter's approval and defrayed by a tax levy on the city property, to be collected as other city taxes and the money paid into the city treasury. The title to all school property was to be taken in the name of the city, and conveyances were to be made by the city officers. Said Mr. Justice Mitchell, at page 14 [of 40 Minn., 41 N. W. 540, 3 L.R.A. 46, 12 Am. St. 687] after reciting the foregoing:

"These and other provisions of the act which might be referred to, show beyond all doubt that its purpose was to adopt a policy, and not a mere arbitrary geographical line, and that this policy was to establish a uniform school system, not for the territory then happening to be within the city, but for the city, whatever its area might be, whether enlarged or diminished in the future; and that the board of education, although invested with certain limited corporate powers,

should be one of the departments of the city government, much like a board of public works or park commissioners."

In State v. West Duluth Land Co. 75 Minn. 456, 78 N. W. 115, the court considered a special act for the formation of the Independent School District of the City of Duluth; the question being whether the act was contrary to Const. art. 4, § 33, subd. 7, as it then existed, prohibiting special laws "for granting corporate powers or privileges, except to cities," that is by acts of incorporation. The court said, at page 469:

"And the legislation was in fact for a city. Chapter 312 simply provided that the city of Duluth should be an independent school district, its board of directors to bear the corporate name of 'The Board of Education of the City of Duluth.' Provision was made for the annual election of members of the board from among the qualified electors of the district, and, as a consequence, of the city; and their duties and powers were prescribed. This entire act could have properly been made a part of the city charter, for under it the schools of the city are nothing but one of its executive departments."

In Jackson v. Board of Education of City of Minneapolis, 112 Minn. 167, 127 N. W. 569, the special law establishing Minneapolis as a school district and declaring the Board of Education a corporation, was construed as a part of the city charter; the court saying, at page 171:

"The maintenance of public schools in conformity with the Constitution of the state is one of the public duties imposed upon the various governmental and administrative divisions of the state, and in carrying out that duty it is immaterial whether or not a distinct legal entity is brought into existence for the purpose of securing the performance of the duty."

In Schroeder v. City of St. Paul, 115 Minn. 222, 132 N. W. 317, the court, in speaking of the provisions of the Home Rule Charter, said at page 227:

"The central idea of the system seems to be that the board has full authority over the management of the schools, the selection and salaries of the teachers, the care of the property of the district, and the courses of study. It has no power to make contracts, whether

for school sites and buildings or for supplies, and no power to pur-
chase. The council determines each year in advance what the ex-
penditures for school purposes for that year shall be, within limits
prescribed by the charter. The board exercises the powers conferred
upon the district solely under the common council, except as in the
charter otherwise provided."

Under these decisions we think there can be no doubt as to the
power of the legislature to vest the management of school affairs in
a municipality. Indeed, relator seeks by this proceeding to reinstate
such system, which is provided by the Home Rule Charter. We
hold that the Commission Charter is not violative of either section
2 or 3 of article 8 of the Constitution.

2. Does the Commission Charter contravene Const. art. 4, § 36?
As we have seen no constitutional provision stands in the way of the
right of the legislature to place the public schools and libraries of a
district coterminous with a municipality, under municipal depart-
mental control; and it remains to be seen whether this article of the
Constitution authorized the qualified voters of respondent city to
adopt a charter to that effect. The framers of the Commission Char-
ter were confronted with the educational situation already created
by Sp. Laws 1891, p. 268, c. 36, incorporated in the Home Rule
Charter, according to which the city was a separate and independent
school district, vested with all the powers and rights specified in any
general law relating to school districts, in all matters pertaining to
public schools; such powers, however, being exercisable through a
board of seven school inspectors appointive by the mayor, but solely
under the legislative department of the city government, and pos-
sessing, subject to the city's direction and supervision, all powers and
rights theretofore vested in the board of education of the city, ex-
cept the right and power to be a corporation or as might otherwise
be ordained by the city under the provisions of the act. Further-
more, it was provided by the act of 1891 that the board of education
should cease to be a corporation after May 15, 1891, and the board
of inspectors created thereby should, "as the head of an executive
branch of the government of the city of St. Paul, execute all the
powers vested by this act or by the general laws of the state in any

school district or in the city of St. Paul as a separate and independent school district, and no other powers." The effect of the special act and the Home Rule Charter, therefore, was to merge the school district in the municipality, with the same territorial boundaries, and the specific question for determination is: Did the city have the right, under its Commission Charter framed and adopted under article 4, section 36, and related statutes, to retain the educational department already established by the legislature? This article is too long to quote; but it empowers cities and villages to frame charters for their own government "consistent with and subject to the laws of this state;" provides for submission thereof to the electors for ratification, and that before any city shall incorporate thereunder the legislature shall prescribe by law the general limits within which the charter shall be framed, which, however, must always be "in harmony with and subject to the Constitution and laws of the state;" and in order that legislative control may not be wholly lost by a prospective charter, power is specifically saved to the legislature to "provide general laws relating to affairs of cities * * * which * * * shall be paramount while in force to the provisions relating to the same matter included in the local charter herein provided for." Manifestly the purpose of article 4 was to give cities the maximum freedom of self-government consistent with the general welfare of the state (State v. City of Mankato, 117 Minn. 458, 136 N. W. 264, 41 L.R.A.[N.S.] 111), and the occasion for and conditions leading to its adoption are well stated in State v. O'Connor, 81 Minn. 79, 83 N. W. 498, the present Chief Justice saying at pages 83, 84:

"By a constitutional amendment in 1891, special legislation as to cities and villages was wholly prohibited. Thereafter all incorporated cities and villages were limited in the conduct and management of municipal affairs to the power and authority theretofore contained in and conferred by their charters, to which no amendments or additions could be made. The result of this was to hamper and embarrass such cities and villages in the conduct of their affairs. Exigencies and new conditions arose, which demanded and required the exercise of greater power than was conferred upon them; but the legislature was powerless to act, except perhaps by general legisla-

tion, which was impracticable, because of the varied interests, duties and responsibilities of different cities. The Constitution prohibited granting any further privileges to such cities, and as a consequence the administration of public affairs thus became very much embarrassed and involved. To obviate all these difficulties, and to place such cities on a broader basis, and in a position prepared to meet and deal with new conditions sure to follow their advancement and growth, it was deemed wise and advisable to authorize them to frame and adopt their own charters."

So far as concerns matters other than those relating to schools, our attention has not been called to any provision of the Commission Charter violative of G. S. 1913, §§ 1354, et seq., these being the statutory authorization for the commission form of government, and relator's contentions in this regard are not sustained. But if the charter contains any provisions relative to schools and educational matters out of harmony with the Constitution and general laws, they cannot be sustained. Likewise, if the powers and duties therein prescribed as to education trench upon the system provided by the legislature for the state, it would be inoperative, because the Constitution renders the charter subject to the limitations involved in the operation of general laws. Merely transferring control from a board of seven inspectors to the city commissioners cannot be considered as contrary to the Constitution; for it is the system, and not the officering, of schools, that constitutes the matter of constitutional concern, as is established, we think, by the authorities already cited. Is there, then, anything in the Commission Charter inconsistent with or derogatory to the general policy of the state indicated by our laws and decisions with respect to educational facilities? In addition to the transfer of the general control of the schools and libraries of the city "as a special school district," from the school inspectors under the Home Rule Charter and the act of 1891, to the mayor and commissioners under the Commission Charter, the latter provides for their establishment, maintenance and management with a thoroughness of plan and completeness of detail that conclusively negatives any suggestion of impairment or insufficiency; special and careful provision being made for appointment of superintendent of schools, librarian,

teachers and assistants, school and library advisory boards, administrative rules and regulations, scholarship, courses, books, attendance, finances and acquisition and control of property.    Indeed, neither the petition nor the writ suggests that inefficiency or inadequacy or diminution of the standard of the schools has or will be entailed by the change of administrative system, and there is no allegation to the effect that the constitutional requirement of "a thorough and efficient system of public schools" will not be complied with, or that the schools as now or hereafter to be administered will afford less educational facilities than those possessed by any district in the state. Furthermore, G. S. 1913, § 1345, enacted pursuant to the constitutional mandate for legislative limitations as to the frame of the charter, after setting out general directions as to its contents, provides:

"Subject to the limitations in this chapter provided, it may provide for any scheme of municipal government not inconsistent with the Constitution, and may provide for the establishment and administration of all departments of a city government, and for the regulation of all local municipal functions, as fully as the legislature might have done before the adoption of sec. 33, art. 4, of the Constitution.    It may omit provisions in reference to any department contained in special laws then operative in said city or village, and provide that such laws, or parts thereof as are specified, shall continue in force therein."

And section 2754, relating to boards of education in cities with more than 50,000 inhabitants, exempts therefrom cities acting under home rule charters.

In short, the legislature, in the first instance, commingled the school district with the municipality.    The framers of the Commission Charter accepted this situation as they found it; but they were not required to leave so important a matter as education untouched for all time nor in the same administrative form as previously.    Beyond doubt the legislature could have effected the change made, and the people of the district, being the same as those of the city, were vested with like power.    State v. City of Mankato, supra.    Both the fundamental and statutory law gave them this right, and having

exercised it their will must stand, unless there is some reason to the contrary not yet considered; for no predicate has thus far been shown for persuasive constitutional objection, nor any reasonable basis for suggestion that the administrative scheme adopted involves increased danger of political manipulation. In any event, mere undesirability of the plan established is for the consideration of the legislature, and not of the courts.

3. Constitution, art. 4, § 36, was adopted in 1896 and amended in minor regards in 1898. It provides for the submission of a proposed charter to the "qualified voters" of the city or village for which it is intended. Article 7, section 8, was ratified in 1898. It reads as follows:

"Women may vote for school officers and members of library boards, and shall be eligible to hold any office pertaining to the management of schools or libraries. Any woman of the age of twenty-one years and upwards and possessing qualifications requisite to a male voter, may vote at any election held for the purpose of choosing any officers of schools or any members of library boards, or upon any measure relating to schools or libraries, and shall be eligible to hold any office pertaining to the management of schools and libraries."

Are the provisions of the Commission Charter in question invalid, because women were not granted the right to vote on them, and thereunder can neither vote for the city officers to whom the general administration of the school and library affairs of the municipal district is committed, nor themselves hold such offices? This is the ultimate question depending upon the effect of these provisions of the Constitution; but at its threshold stands another proper to be considered as bearing upon the construction to be given them, namely: Had the educational features of the act of 1891 been incorporated bodily into the Commission Charter, instead of the provisions chosen, would women have had the constitutional right to vote on its adoption or hold elective offices in anywise relating to schools and libraries thereunder? True, relator insists that this question is not here material because not in issue, but it cannot be thus summarily disposed of by mere assertion. As has been shown, at the time of the adoption of both sections the legislature had for years commingled

school and municipal affairs, and women have never been considered as within the term "qualified voters," as used in section 36, article 4 (Oppegaard v. Board of Commrs. of Renville County, 120 Minn. 443, 139 N. W. 949); for section 8, article 7, while self executing, extended the right of suffrage and eligibility to office only within the limitations therein expressly declared. In considering these provisions our fundamental law, no less than the Federal Constitution (see Prout v. Starr, 188 U. S. 537, 543-544, 23 Sup. Ct. 398, 47 L. ed. 584), must be regarded as one instrument, all the provisions of which are to be deemed of equal validity, accorded equal effect, and interpreted so that each and all of them will be respected and observed. As said by Chief Justice Start in State v. Stearns, 72 Minn. 200, 211, 75 N. W. 210:

"The several provisions of the Constitution * * * must be construed together, as a whole, and with reference to the purposes for which the Constitution was ordained. It is not permissible to select a single, isolated provision, and give it effect according to its literal reading, without reference to modifications made by the express language of other provisions of the instrument."

We think it would not be contended that the people, by the suffrage amendment, intended to overturn all existing conditions, nor that, if the framers of the Commission Charter had chosen to follow the former charter as to educational matters, women would have had the right to vote for or hold any elective office thereby provided for. Section 8, when fairly construed, means that women shall have the right to vote for elective school officers and members of library boards as such, and are eligible to hold such offices. It expressly provides that they may vote at any election *"held for the purpose of choosing* any officers of schools or any members of library boards, or upon any measure relating to schools or libraries, and shall be eligible to hold any office pertaining to the management of schools and libraries." Certainly, if the intention had been to extend the rights claimed by relator to all matters involving schools and libraries, different language would have been chosen, and at least some effort made to harmonize the provision with other constitutional limitations; for obviously the adoption of any charter sufficiently compre-

hensive to cover the needs of a municipality would otherwise be impossible. Hence we do not think there is foundation for the position that women have the right to vote for officers of municipalities, merely because their functions pertain in some degree to educational matters. No greater departure from established ideas has heretofore been suggested than that no elective officer in this state whose duties touch the domain of education can be validily chosen without according women the right to vote for him. Yet relator's argument, followed to logical conclusion, leads to that result, which, furthermore, would require readjustment of the entire electoral system of the state, if, indeed, any plan could be devised which would effectuate the suffrage amendment as thus extended, and at the same time keep within the bounds of other provisions of the Constitution. If relator's contention is sustained, it inevitably follows that after the ratification of article 7, § 8, and before the Commission Charter went into effect, women had the right to vote for mayor, for he was the appointive head of the schools—a position so manifestly unconstitutional, when we remember that women are not and have never been "qualified voters" generally, as to require no discussion.

Under the present charter, as for many years heretofore, the general school officers and members of library boards in the municipal school district have been appointive, as distinguished from elective, and women now have the same rights as ever in these capacities. Their status in relation thereto is the same under the new as under the old system, and they have neither gained nor lost any legal right. The substitution of the one system for the other without changing or taking away any prior legal right cannot be held violative of our fundamental law.

We hold that women were deprived of no constitutional right when refused the privilege of voting on the adoption of the Commission Charter; that the instrument is valid; that they have no right to vote for mayor because he is vested with power to appoint the commissioner of education, nor for members of the city council because to them is committed the general control of educational matters as constituting one of the departments of the municipal government.

Writ quashed.