COMMON COUNCIL OF THE CITY OF DETROIT v. ENGEL.

1. CONSTITUTIONAL LAW — CITY CHARTER — DETROIT CHARTER — AMENDMENT.

Under the amended Constitution, authorizing cities to amend their charters without an entire revision and framing a new instrument, the city of Detroit may amend its charter without regard to Act No. 203, Pub. Acts 1911, declared invalid by this court. *Attorney General* v. *Common Council*, 164 Mich. 369 (169 N. W. 879).

2. SAME—MUNICIPAL CORPORATIONS—BONDS.

As the authority of the city of Detroit to issue bonds was in existence prior to the adoption of the Constitution

of 1909, and continued in force by the adoption of amendments to the charter, under the authority of the amended Constitution, and Act No. 5, Pub. Acts 1913, the consent of the electors, necessary in other cases, to the issuance of municipal bonds, in excess of the 2 per cent. limitation in the city charter, was unnecessary; the power of issuing bonds in excess of the former limitation may not be exercised by the common council, pursuant to the amended charter.

3. SAME—ILLEGAL PURPOSES.

But bonds for hospitals, garbage reduction, and so forth, not included in the public building fund under charter provisions as amended, cannot be issued for purposes that have not been previously declared by a change in the charter provisions.

4. SAME—MANDAMUS—ISSUES.

If the improper conclusions of the circuit court on mandamus were distinct from the correct findings or determination, so that the issues were separate, the court on certiorari may affirm the correct positions of the judgment and quash the remainder.

Certiorari to Wayne; Mandell, J.   Submitted June 15, 1915.   (Calendar No. 26,818.)   Decided July 2, 1915.

Mandamus by the common council of the city of Detroit against George Engel, city controller, to compel respondent to issue certain bonds.   An order granting the writ is reviewed by respondent on certiorari.   Affirmed in part and reversed as to remainder.

*Stevenson, Carpenter, Butzel & Backus, Leo M. Butzel, Hawkins, Delafield & Longfellow, Frederick P. Delafield* and *William Henry Hoyt,* for appellant.

*Richard I. Lawson* and *Edmund Atkinson* (*Harry J. Dingeman,* of counsel), for appellee.

STEERE, J. This contention involves the validity of certain bonds authorized by the common council of the city of Detroit and about to be issued, but which respondent refused to prepare, record, and deliver in compliance with provisions of the city charter respecting his official duties on the ground that said bonds could not be lawfully issued, unless authorized by a three-fifths vote of the electors of the city at a general or special election.

On application by relator to the circuit court of Wayne county, a writ of mandamus was issued commanding the controller to prepare said bonds, cause the same to be duly executed and recorded in the books of his office, and transmit them to the city treasurer, for delivery to the parties to whom they had been sold and awarded. The matter is now here upon certiorari to review the circuit court order granting such writ of mandamus.

Under authority of section 7, chap. 11, of the Detroit city charter, its common council, in 1914, by regular resolution, authorized, and the board of estimates of the city approved, the issuance of bonds as follows: $503,000 for public sewers; $383,000 for garbage reduction plant; $600,000 for municipal court building; $695,000 for hospital site and buildings; $25,000 for a city garage; $585,000 for conduit construction for public lighting system; and $72,000 more for public light conduits—making a total of $2,863,000. Thereafter the common council, on January 19, 1915, took action for the sale of, and advertised for proposals to purchase, bonds as follows: $200,000 30-year public sewer bonds, $270,000 30-year public building bonds, $408,000 10-year public building bonds, and $350,000 10-year public lighting bonds—making a total of $1,228,000. They had been advertised for sale in accordance with charter provisions, and bids for their purchase received

when a question as to their validity arose, resulting in this litigation.

It seems to be conceded that the various steps taken by the common council authorizing these bonds, followed, and were in compliance with, charter provisions, and the first question raised is whether certain of those charter provisions of the city of Detroit have been so superseded or modified by subsequent constitutional restrictions and general legislation relative to incorporation of cities that municipal bonds issued in compliance with them are not valid.

Although the city of Detroit has in some particulars amended its charter piecemeal since the adoption of our present Constitution, which took effect January 1, 1909, there has been no adoption of a new or general revision of its old charter. The charter provisions, upon which the legality of these bonds depends, antedated the present Constitution, which, under sections 20 and 21, art. 8, requires the legislature to provide by a general law for incorporation of cities, and shall, amongst other things restrict, or set a limit upon, their power of borrowing money and contracting debts. Said section 21 provides that, under such contemplated general law relative to cities, the electors of each city shall have power to frame, adopt, and amend their charter and through regularly constituted authority pass all ordinances relating to municipal concerns, subject to the Constitution and general laws of the State.

In compliance with these constitutional requirements, Act No. 279, Pub. Act. 1909 (2 How. Stat. [2d Ed.] § 5442 *et seq.*), known as the "Home Rule" law, was passed, which declared (section 2) that "each city now existing shall continue with all its present rights and powers until otherwise provided by law," and (section 4, subd. *"b"*) that any city could in its charter provide for borrowing money on the city credit in

a sum not to exceed 8 per cent. of the total assessed valuation; but in cities where the amount of money which might be borrowed was at the time of the enactment of the law limited, such limitation must continue until raised or lowered by a two-thirds vote of the electors; also that " no city shall have power to incur indebtedness or issue bonds of any kind except for emergency purposes as above stated, and bonds secured only by mortgage on the property and franchise of a public utility which shall exceed in the aggregate ten per centum of the assessed value of all the real and personal property in the city."

This court has several times been called upon to consider those provisions of the Constitution and the home rule act which followed, conferring upon cities autonomous powers not previously possessed, in the course of which it was held that an existing city could not in the first instance amend its old charter piecemeal.

In *Jackson Common Council* v. *Harrington,* 160 Mich. 550 (125 N. W. 383), decided March 21, 1910, the validity of the home rule act of 1909 was sustained as constitutional and construed in part, a writ of mandamus being granted to compel the city recorder to give official notice, as provided in said act, of a resolution by the common council declaring for a general revision of the Jackson city charter.

In *Attorney General, ex rel. Hudson,* v. *Common Council of Detroit,* 164 Mich. 369 (129 N. W. 879), decided February 1, 1911, the act was again under consideration in an application to review an order of the Wayne county circuit court dismissing a petition of the attorney general filed on relation of certain taxpayers of the city for a writ to restrain the common council from submitting to a vote of the electors a proposal to amend the Detroit charter. The consti-

tutionality of the act was again attacked and sustained; the court saying in part:

"We are of the opinion that the method of presenting a proposed amendment provided for is within the power necessarily committed to the legislature to provide the method of executing the constitutional provision as fully as the power to prescribe the method of proposing a revision of a charter, which we held to be constitutional in *Jackson Common Council* v. *Harrington, supra.*"

But the order dismissing relator's petition was overruled and a writ granted on the ground that, under the Constitution, Act No. 279, *supra,* could not be construed as authorizing cities to amend their old charters piecemeal, because the language of the Constitution authorizing a city to "frame, adopt and amend its charter" must be construed as meaning a charter thereafter framed and adopted under the general law, or laws, to be enacted. This decision, that revision must precede amendment, tied existing cities to their old charters without power of change, except through a new charter *in toto* or a general revision of the old, framed or made by a commission and adopted by popular vote, subject to the compulsory and restrictive provisions incorporated in the general law, as directed by the Constitution.

The amount of money which could be borrowed by the city of Detroit for strictly municipal purposes was limited by its existing charter to 2 per cent. of its assessed valuation, and it was sought to increase this limit, without a general revision under Act No. 279, *supra,* by a local act of the legislature (Act No. 302 Local Acts 1911), approved March 23, 1911, amending section 7, chap. 11, of the charter, with a referendum clause; this local act being given immediate effect to preserve "public peace, health, and safety." The Constitution of 1909 having deprived the legislature of the power to pass local laws amending city charters, .

this act was palpably unconstitutional and so held without serious contention to the contrary in *Attorney General* v. *Thompson,* 168 Mich. 511 (134 N. W. 722), decided February 16, 1912. At the same session of the legislature, said Act No. 279, *supra,* was sought to be amended by a general act (Act No. 203, Pub. Acts 1911), approved April 29, 1911, changing section 2 to read:

"Each city now existing shall continue with all its present rights and powers except as herein otherwise provided"

—and authorizing amendments of city charters without prior revision.

In *Attorney General, ex rel. Vernor,* v. *Detroit Common Council,* 168 Mich. 249 (133 N. W. 1090), decided January 15, 1912, this act was also held in that particular to be in violation of said sections 20, 21, art. 8, of the Constitution, which had been interpreted in the *Hudson Case* as intending a general law which should operate uniformly in all cities acting under it and did not permit a general law which authorized cities to amend only specified sections of their charters and leave them—

"repugnant to the general law adopted under article 8, § 20, of the Constitution, so that cities claiming to operate under a general law intended to operate uniformly upon the local legislatures of all cities would be subject to such limitations as they should choose to accept and might adopt such provisions as they deemed beneficial."

In *Gallup* v. *City of Saginaw,* 170 Mich. 195 (135 N. W. 1060), decided May 4, 1912, the subject was again before this court in an attempt by complainant to restrain the city of Saginaw from proceeding further in action taken to revise its charter under Act No. 279, Pub. Acts 1909, as amended by Act No. 203, Pub. Acts 1911. Both the validity of the original act

and the constitutionality of the amendment were attacked and contested in the trial court, and it was there held that the amending act (Act No. 203, Pub. Acts 1911) was unconstitutional and void in its entirety, but the injunction applied for was denied and the city permitted to proceed with its proposed charter revision under the original act of 1909. The conclusions of the trial court were sustained by this court and its decree affirmed.

At the general biennial election held November 5, 1912, section 21, art. 8, of the State Constitution, was amended so as to authorize piecemeal amendment of existing city charters without previous revision, including those "theretofore granted or passed by the legislature for the government" of cities, and by section 38, Act No. 5, Pub. Acts 1913, the home rule act of 1909 was amended; the expressly stated intent of the amendment being to—

"re-enact sections twenty-one, twenty-two, twenty-three and twenty-four, as above amended pursuant to the adoption of the amendment to section twenty-one, of article eight of the State Constitution, by vote of the electors on November five, nineteen hundred twelve, so that cities under existing charters heretofore granted by the legislature shall have the same right and power to amend such charters under the act hereby amended as cities that have adopted complete charter revisions."

At a municipal election held in the city of Detroit on April 7, 1913, a proposed amendment of section 7, chap. 11, of its charter, increasing the bonding limit of the municipality from 2 to 4 per cent., was adopted by a large majority vote of its electors. With this increase the bonding limit of the city did not exceed one-half the possible limit fixed by the home rule act, or any of its amendments, and no question of a possible violation of that limit is involved here.

In *Attorney General, ex rel. Barbour,* v. *Lindsay,* 178

Mich. 524 (145 N. W. 98), in which Act No. 5, Pub. Acts 1913, was under consideration, this court held that the legality of said amendment (to section 7, chap. 11, of the Detroit charter), increasing its bond limit from 2 to 4 per cent., could not be questioned. The amendment of said section so recently adopted increasing the limit to 4 per cent. indicates an intent and purpose, on the part and so far as within the power of the electorate of the city, that the section should remain in force. If each issue within that limit could only be by a vote of the electorate, why and for whom should they fix a general limit?

As before stated, the course prescribed by section 7, chap. 11, of the charter, was followed in authorizing and issuing these bonds, but it is urged that, with this limit fixed by a popular vote amending the section in question, bonds not exceeding the limit cannot be lawfully authorized and issued in compliance with the provisions of said section unless each issue is approved by a three-fifths vote of the electors at a general or special election, in compliance with subdivision *"e"* of section 5 of the home rule act of 1909, as amended by Act No. 203, Pub. Acts 1911. As amended said subdivision provides:

"No city shall have power  *  *  *  to  *  *  * authorize any issue of bonds except special assessment bonds, refunding bonds, and emergency bonds as defined by this act and bonds that it is annually authorized to issue, unless approved by three-fifths of the electors voting thereon at any general or special election."

As originally enacted, the subdivision does not contain this restriction. Without it the authority of the common council and board of estimates to exercise the powers conferred and previously exercised under said section 7, chap. 11, of the charter, cannot be seriously questioned.

By Act No. 203, Pub. Acts 1911, section 2 of the home rule act was amended to read:

"Each city now existing shall continue with all its present rights and powers except as herein otherwise provided."

It is urged the provision for a three-fifths vote in subdivision *"e"* of section 5 should stand, although this act was apparently held unconstitutional in the *Gallup Case,* because there section 2 was not necessarily involved, and the decision, so far as that section is concerned, is not controlling. An examination of the record and briefs in the *Gallup Case* discloses that both the validity of the original act and the constitutionality of the amendment were in issue and passed upon by the trial court. Counsel for complainant elaborately briefed both issues in this court, urging objections against the constitutionality of the amendment, the sufficiency of which opposing counsel conceded here, for which reason the question was not reviewed at length. It was held, however, that the city, in revising its charter, might ignore the provisions of the amendatory act, because it was unconstitutional, and the decision of the trial court that it was void in its entirety was sustained. Whether essential or not to the disposition of that case, we see no sufficient reason to reverse such conclusion.

Section 20, art. 8, of the Constitution, was amended in close sequence, and in the light of those decisions construing it as then prohibiting piecemeal amendments of old charters because of an indicated intent to prohibit a confusing lack of uniformity in city charters, which might otherwise result. This amendment has eliminated those reasons from consideration and emphasized the intent to confer upon cities a large degree of autonomous power in strictly local matters. In Detroit, authority in the council to issue bonds for

187 Mich.—7.

certain purposes, according to the provisions of section 7, chap. 11, of its charter, existed at the time and long before the adoption of the Constitution of 1909. By that Constitution, which first provided for the home rule law and now by express terms authorizes piecemeal amendment of old charters, Detroit continued with all its former charter rights and powers, whatever they were, until otherwise provided by law. The amendment to section 7, raising its bond limit from 2 to 4 per cent., introduced no new feature which in any particular contravened the Constitution or any general law of the State.

Objection is further made to the proposed issue of $350,000 10-year public lighting bonds, for the reason that, with those now outstanding, they exceed the limit authorized by the charter. The charter authorizes the common council to establish a public lighting plant, "the cost of which shall not exceed $800,000." It is also provided in that connection that funds for that purpose may be raised by tax or by bonds, in the discretion of the council, "payable at such time and in such amount and at such rate as the council may determine" and the board of estimates may approve. "Such amount" as the council may determine should be read and construed in connection with what precedes and which makes plain that the cost of said plant, whether paid for by taxation or bonds, shall not exceed $800,000. This necessary construction was manifestly adopted by the city authorities when the $800,000 so authorized had been expended. Desiring an additional $150,000 for that purpose, a local act of the legislature was deemed necessary and secured (Act No. 468, Local Acts 1905) which authorized a bond issue for that amount.

The authority of the common council of Detroit is, however, conferred and limited by its charter. Section 7 of chapter 11 empowers the council only to issue

bonds for "the public sewer fund for construction of trunk public.sewers, and the public building fund and a fund for the purchase or construction of public utilities," and provides that "bonds issued by authority of this section shall be respectively denominated 'public sewer bonds,' 'public building bonds,' and 'public utility bonds.' " Section 1, chap. 11, of the charter (Act No. 326, Local Acts 1883), thus defines the public building fund:

"Public building fund, for purchasing any real estate for the erection thereon of any public buildings, and to defray the expenses of erecting, repairing, and preserving such public buildings as the common council is authorized to erect and maintain, and are not herein otherwise provided for, which fund shall, from time to time, be divided into special building funds, to defray the expenses of erecting, repairing, and preserving the particular building or buildings for which such special building fund may be constituted or raised."

It is to be noted that in the original authorization by the council of bonds aggregating $2,863,000 there were included $383,000 for a garbage reduction plant and $695,000 for hospital site and buildings. The bonds proposed to be sold and in issue here aggregate $1,228,000, and no mention of garbage plant or hospital site and buildings is made, but they include $270,-000 30-year public building bonds and $408,000 10-year public building bonds. It is urged against these that under the name of "public building bonds" was necessarily included and manifestly intended to be issued a part of the hospital and garbage plant bonds; that buildings for which public building bonds may be authorized and sold by the common council are public buildings, within the meaning of the charter, which does not include garbage plants or hospitals. Not only is a garbage fund and a hospital fund "otherwise provided for" in the charter, which at least raises a doubt as to the intent to include those subjects in the section

relating to a public building fund, but the legislative interpretation of the council's authority in that connection makes plain that it does not, as subsequently shown.

It is to be borne in mind that the provisions referred to are a part of the city charter granted by the legislature to Detroit before the Constitution of 1909 gave cities the power, through the legislature, to adopt, revise, and amend their charters, and, as just pointed out, said charter remains in force until the city sees fit to change it. Before the common council could issue bonds to erect and equip a hospital for contagious diseases, it was found necessary to obtain authority to do so from the same power which granted the charter (Act No. 404, Local Acts 1905), and in like manner an amendment of the city charter was obtained (Act No. 670, Local Acts 1905) to authorize the common council to issue bonds to the extent of $100,000 to provide a garbage and refuse plant. While it is now within the power of the city to amend its charter and authorize the council to issue further bonds for that purpose, we do not discover that it has done so, and, until it does, that authority does not rest in the council.

The "public building bonds" proposed to be sold, and involved here, total $678,000. Exclusive of garbage reduction plant and hospital site and buildings, $625,-000 public building bonds were originally authorized. It is to be assumed that the proceeds of any bonds sold will be applied as legally authorized.

It follows from the foregoing that the writ of mandamus granted by the circuit court cannot be sustained in its entirety.

Distinct determinations of the circuit court as to different proposed issues of bonds are involved and presented for review in this proceeding. The legal and illegal matters are independent of each other and

plainly ascertainable. This court may therefore quash or correct such parts as are illegal and affirm as to those which are legal.

We accordingly conclude, for the reasons stated, that the order for a writ of mandamus be affirmed as to the $200,000 public sewer bonds and the public building bonds to the previously authorized amount of $625,000 (deducting the excess from either the 30-year or 10-year issue as relators may elect), and reversed as to the other proposed issues, which are hereby held illegal; this without costs to either party.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.