BANKHEAD *v.* MAYOR OF RIVER ROUGE

OPINION OF THE COURT

1. STATUTES—ONE OBJECT—EXPRESSED-IN-TITLE RULE—PURPOSE—CONSTITUTIONAL LAW.

> The purpose of the constitutional provision requiring that a statute have only one object which shall be expressed in its title is to make certain that the title gives notice to legislators and other interested parties of the statute's object so as to assure them that only matters germane to the object expressed in the title will be enacted (Const 1963, art 4, § 24).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 50 Am Jur, Statutes §§ 190, 193.
[2] 50 Am Jur, Statutes § 165 *et seq.*
[3] 50 Am Jur, Statutes § 194.
[4] 50 Am Jur, Statutes §§ 165–179.
[5] 50 Am Jur, Statutes §§ 159, 183.
[6] 50 Am Jur, Statutes § 183.
[7] 16 Am Jur 2d, Constitutional Law §§ 496–501.
[8, 12–14] 50 Am Jur, Statutes §§ 13, 201, 202.
[9, 15, 16, 18, 21–23] 50 Am Jur, Statutes §§ 8–13, 200–202.
[10] 16 Am Jur 2d, Constitutional Law § 146.
[11] 50 Am Jur, Statutes § 190 *et seq.*
[17] 50 Am Jur, Statutes §§ 170, 171, 195, 200–202.
[19] 50 Am Jur, Statutes §§ 8–12.
[20] 40 Am Jur 2d, Housing Laws and Urban Redevelopment §§ 2, 10.

2. STATUTES—OBJECT-IN-TITLE RULE—CONSTITUTIONAL LAW.

> The title of an act must be broad enough to permit the enactment of the provisions in its body; the body of the act must be reasonably harmonious with its title (Const 1963, art 4, § 24).

3. STATUTES—ONE OBJECT—EXPRESSED-IN-TITLE RULE—TEST—CONSTITUTIONAL LAW.

> The test to be applied to determine whether an act complies with the constitutional requirement that no law shall embrace more than one object which shall be expressed in its title is to ask whether the title of the act fairly indicates the purpose of the legislation, does the title fairly inform legislators and the public of the act's purposes as a whole, and is the title a fair index of the act (Const 1963, art 4, § 24).

4. STATUTES—OBJECT-IN-TITLE RULE—MUNICIPAL CORPORATIONS—CONSTITUTIONAL LAW.

> A statute may not be applied to local governments not indicated in the statute's title where the title relates to designated municipal corporations (Const 1963, art 4, § 24).

5. STATUTES—CONFLICT BETWEEN TITLE AND BODY—CONSTRUCTION.

> A statute's title shall prevail over conflicting portions of its body where the body is broader in scope than the limitations in its title.

6. STATUTES—MUNICIPAL CORPORATIONS—HOUSING FACILITIES ACT—CONFLICT BETWEEN TITLE AND BODY.

> A board of tenant affairs need not be established for cities with public housing projects where the city has a population less than 1,000,000, because even though the body of the municipal housing facilities act mandates the creation of a board without limitation as to population, the title of the act specifies that boards are to exist only for cities with populations of 1,000,000 or more (Const 1963, art 4, § 24; MCLA § 125.651 *et seq.*).

7. CONSTITUTIONAL LAW—EQUAL PROTECTION—STATUTES—CLASSIFICATION BY POPULATION—REASONABLE RELATIONSHIP.

> Legislative classification by population will be upheld where there is a reasonable relationship between the restriction and population; equal protection of the laws does not prevent reasonable classification by legislation and the ultimate decision of the wisdom of that reasonable classification rests with the Legislature (US Const, Am 14; Const 1963, art 1, § 2).

8. STATUTES—MUNICIPAL CORPORATIONS—POPULATION CLASSIFICA-
TION—1,000,000 POPULATION CLASSIFICATION.
   Legislation which contains a population classification which limits
   the present application of the statute to municipalities with
   populations over 1,000,000 is not necessarily local or special
   legislation.

9. STATUTES—MUNICIPAL CORPORATIONS—HOUSING FACILITIES ACT—
CLASSIFICATION BY POPULATION—EQUAL PROTECTION—CONSTITU-
TIONAL LAW.
   The municipal housing facilities act which gives tenants in a
   public housing project a board of tenant affairs only in those
   projects in cities with populations of 1,000,000 or more does
   not violate equal protection and does not cause the statute
   to be an unnecessary local or special act, because the Legisla-
   ture could reasonably have determined that tenants of public
   housing projects in large cities face considerably different
   problems than those in smaller cities (US Const, Am 14; Const
   1963, art 1, § 2, art 4, § 29; MCLA § 125.651 *et seq.*).

CONCURRENCE IN PART AND DISSENT IN PART
BY LEVIN, J.

10. STATUTES—PRESERVATION OF CONSTITUTIONALITY—CONSTRUCTION.
   *A court has the duty to construe the language of a statute, sub-
   ject to constitutional infirmity, in such a way, if possible, as to
   preserve the statute's constitutionality.*

11. STATUTES—MUNICIPAL CORPORATIONS—HOUSING FACILITIES ACT—
CONSTRUCTION.
   *The municipal housing facilities act is not violative of the con-
   stitutional requirement that no law shall embrace more than one
   object which shall be expressed in its title, even though the
   title of the act limits the power to create boards of tenant
   affairs to localities of population of 1,000,000 or over and the
   body of the act has no population limit to the power, because
   a court, in order to preserve the act's constitutionality, will read
   the population limitation into the act's body (Const 1963, art 4,
   § 24; MCLA § 125.651 et seq.).*

12. STATUTES—LOCAL OR SPECIAL ACT—PROHIBITION—PURPOSE.
   *The purpose of the constitutional requirement that the Legisla-
   ture shall pass no local or special act where a general act can be
   made applicable is to prevent unwarranted interference by the
   Legislature in purely local matters and to insure that all*

*legislation will receive grave attention by all legislators by preventing those from areas unaffected by the act from complaisantly accepting its enactment (Const 1963, art 4, § 29).*

13. STATUTES—POPULATION CLASSIFICATION—LOCAL OR SPECIAL ACT.
    *Classification by population is not inevitably consistent with the constitutional requirement that no special or local act be passed where a general act can be made applicable (Const 1963, art 4, § 29).*

14. STATUTES—LOCAL OR SPECIAL ACTS—POPULATION CLASSIFICATION.
    *A statute whose applicability is based on population differences will be upheld as not being an unnecessary local or special act where the existence or nonexistence of the problem sought to be solved can accurately be stated in terms of population; however, because there are always distinguishing features between the problems faced in a small city and a large city, the difference in population itself cannot be the basis for the act's limited application.*

15. STATUTES—LOCAL OR SPECIAL ACT—APPLICABILITY OF GENERAL LAW.
    *The Legislature is given some leeway in its determination whether the problem focused upon by a statute exists in only one community; however, the question whether a general act can be made applicable to the problem is a judicial question and the courts must carefully scrutinize the determination made by the Legislature (Const 1963, art 4, § 29).*

16. STATUTES—MUNICIPAL CORPORATIONS—HOUSING FACILITIES ACT—CONSTITUTIONAL LAW.
    *The municipal housing facilities act which confers significant individual rights upon tenants in public housing projects but limits the applicability of those rights to tenants in localities with populations of 1,000,000 or over is violative of the constitutional prohibition of a local or special act where a general act could have been made applicable where not even a scintilla of evidence has been introduced to show a real difference justifying the population classification; the contention that small city housing project tenants have less problems or significantly different problems from large city housing project tenants is merely an unproven hypothesis (Const 1963, art 4, § 29; MCLA § 125.651 et seq.).*

17. STATUTES—LOCAL OR SPECIAL ACT—1,000,000 POPULATION CLASSIFICATION—PRESUMPTION OF VALIDITY.
    *The presumption of validity that generally attaches to legisla-*

*tion does not attach to a statute which confers significant legal rights, and which on its face, by reason of a population classification of 1,000,000 or more, does not apply and is not likely to apply in the foreseeable future to more than one city in this state, where the statute is being attacked as a local act and it is argued that a general act could have been made applicable.*

18. STATUTES—POPULATION CLASSIFICATION—CONSTITUTIONAL LAW.

*A statute containing a population classification which has a reasonable relation to the purpose of the statute is nevertheless invalid as a local act if a general act can be made applicable (Const 1963, art 4, § 29).*

19. STATUTES—POPULATION CLASSIFICATION.

*Legislation containing a population classification can be classed functionally as (1) legislation concerning governmental operations and functions, (2) legislation providing for economic regulation of business, and (3) legislation establishing or concerning individual rights or prerogatives; because individual rights and the needs of citizens are less likely to vary significantly from one community to another, legislation in the third category is less likely to be justified (Const 1963, art 4, § 29).*

20. STATUTES—MUNICIPAL CORPORATIONS—HOUSING FACILITIES ACT.

*The housing facilities act amendments requiring housing commissions to adopt certain rules, creating a board of tenant affairs, and providing for hearings in certain cases were adopted to enlarge and create new rights in public housing tenants, not to facilitate management or to regulate the business of public housing (MCLA §§ 125.694b, 125.699 et seq., 125.703, 125.704).*

21. STATUTES—POPULATION   CLASSIFICATION—GENERAL   ACT—CONSTITUTIONAL LAW.

*An act classifying by population, and thus applicable in less than the entire state, is sustainable as a general act if the act could not have been made more generally applicable (Const, 1963, art 4, § 29).*

22. STATUTES—POPULATION   CLASSIFICATION—GENERAL   ACT—CONSTITUTIONAL LAW.

*A statute which confers advantages on citizens in a favored locale and denies them to citizens residing elsewhere by means of a population classification and which could have been made*

totally general should not ordinarily be declared totally invalid
but should have the unconstitutional population classification
eliminated (Const 1963, art 4, § 29).

23. Statutes—Housing Facilities Act—Population Classifica-
tion—Constitutional Law.
   The title of the municipal housing facilities act limiting the law's
   application to cities with a population of 1,000,000 or more
   should be stricken because the restriction creates a special or
   local act where a general act could have been passed (Const
   1963, art 4, § 29; MCLA § 125.651 et seq.).

Appeal from Wayne, Thomas Roumell, J. Sub-
mitted Division 1 December 7, 1970, at Detroit.
(Docket No. 8948.) Decided June 30, 1971. Af-
firmed by Supreme Court, 387 Mich 610.

Complaint for mandamus by Francis Bankhead
and others to compel John McEwan, Mayor of River
Rouge, to establish a board of tenant affairs in a
River Rouge housing project. Judgment for plain-
tiffs. Defendant appeals. Reversed.

*Craig P. Colby,* for plaintiffs.

*Logan & Huchla,* River Rouge City Attorneys, for
defendant.

Before: Lesinski, C. J., and Levin and O'Hara,*
JJ.

Lesinski, C. J. Plaintiffs, tenants of a housing
project in the city of River Rouge, sought a writ
of mandamus below to compel defendant as mayor
of that city to establish a board of tenant affairs
pursuant to section 49 of the municipal housing

---

* Former Supreme Court Justice, sitting on the Court of Appeals
by assignment pursuant to Const 1963, art 6, § 23 as amended in
1968.

facilities act, MCLA § 125.651, *et seq.* (Stat Ann 1969 Rev § 5.3011, *et seq.*).    Section 49 of the act, MCLA 1971 Cum Supp § 125.699 (Stat Ann 1969 Rev § 5.3056[3]), is a recent amendment (to the act) which, together with other recently added sections,[1] creates boards of tenant affairs for cities with housing commissions and housing projects with the cooperation of the chief executives of the municipalities.    From the trial court's granting of the writ, defendant appeals as of right.

The title to the act, as amended by PA 1968, No 344, § 1, reads:

"An act to authorize any city, village or township to purchase, acquire, construct, maintain, operate, improve, extend and repair housing facilities; to eliminate housing conditions which are detrimental to the public peace, health, safety, morals or welfare; and for any such purposes to authorize any such city, village or township to create by a commission with power to effectuate said purposes, and to prescribe the powers and duties of such commission and of such city, village or township; and for any such purposes to authorize any such city, village or township to issue notes and revenue bonds; to require the issuance, sale, retirement and refunding of such notes and bonds; to regulate the rentals of such projects and the use of the revenues of the projects; to prescribe the manner of selecting tenants for such projects; to provide for condemnation of private property for such projects; to confer certain powers upon such cities, villages and townships in relation to such projects, including the power to receive aid and cooperation of the federal government; to provide for a referendum thereon; *to create a board of tenant affairs in any city of 1,000,000 or over having a housing commission and*

---

[1] MCLA 1971 Cum Supp § 125.700 (Stat Ann § 5.3056[4]); MCLA 1971 Cum Supp § 125.701 (Stat Ann 1969 Rev § 5.3056[5]).

*operating 1 or more housing projects;* to define the powers and duties of such board; to provide for the right of appeal from its determinations; and for other purposes." (Emphasis supplied.)

Section 49 of the act, also added by PA 1968, No 344, provides:

"There is created a board of tenant affairs for each city, village or township having a housing commission and operating 1 or more housing projects as provided by this act."

On appeal, defendant challenges the constitutional validity of § 49 in that the body of the act mandates the creation of a board of tenant affairs for housing project cities, villages, and townships without limitation as to population whereas the title of the act, as amended, indicates that such boards are to exist only for cities with populations of 1,000,000 or more.[2]  Const 1963, art 4, § 24 establishes:

"No law shall embrace more than one object which shall be expressed in its title."

It is axiomatic that the body of an act must be reasonably harmonious with its title. *McKellar* v. *Detroit* (1885), 57 Mich 158. The purpose of the constitutional requirement is to make certain that the title of a legislative act must give notice to legislators, and others interested, of the object of the law, thereby assuring them that only matters germane to the object expressed in the title will be enacted into law. *Continental Motors Corporation* v. *Township of Muskegon* (1965), 376 Mich 170, 179. See, also, *Leininger* v. *Secretary of State* (1947), 316 Mich 644; *Regents of University of Michigan* v. *Pray* (1933), 264 Mich 693; *People* v.

---

[2] The city of River Rouge has a population of approximately 20,000.

*Carroll* (1936), 274 Mich 451; *People* v. *Wohlford* (1924), 226 Mich 166. The title of the act must be sufficiently broad to permit the enactment of the provisions found in the body of the legislation. *People* v. *Wohlford, supra,* p 168. The constitutional test to be applied is in *Vernor* v. *Secretary of State* (1914), 179 Mich 157, 160:

"What is the constitutional test? We think it is that a title must embrace the object of the act, and the body of the act must not be inconsistent with the title. The pertinent questions should be: Does the title of the act fairly indicate the purpose of the legislation? Is the title a fair index of the act? Does the title of the act fairly inform the legislators and the public of its purposes, as a whole?"

Undeniably, the title of the act, as amended, requiring the creation of boards in housing project cities of 1,000,000 or more, is more restrictive in scope than the body of the act which establishes a board for each city, village and township with a housing project.[3] When the title of an act relates to designated municipal corporations and the body of the statute affects municipal corporations not specified by the title, the legislation may not be constitutionally applied to the local governments not indicated by the title. *Wilcox* v. *Paddock* (1887), 65 Mich 23; *Hume* v. *Village of Fruitport* (1928), 242 Mich 698.

We hold that where, as here, the body of the act is broader in scope than the limitations of the title of the act, the title shall prevail over the conflicting portion of the body of the act. See *Arnold* v. *Ogle Construction Company* (1952), 333

[3] The Legislature itself has apparently recognized the defect in the title. HB 3721, introduced April 15, 1969, attempted to cure the imperfection by making title and body consistent by broadening the title. The bill was defeated.

Mich 652. As such we hold that defendant may not be required by virtue of § 49 to establish a board of tenant affairs.

A word is now due on plaintiffs' contention that the above holding deprives plaintiffs of equal protection of law.[4] US Const, Am 14; Mich Const 1963, art 1, § 2. The statute gives boards of tenant affairs broad powers to veto housing commission rules and to review denials of admissions to public housing, evictions, and rental increases. MCLA 1971 Cum Supp § 125.702 (Stat Ann 1969 Rev § 5.3056[6]). Plaintiffs maintain that a construction of the act limiting § 49 of the act to cities with public housing commissions and public housing projects having populations of 1,000,000 or more unconstitutionally deprives them of the right to elect a board which could check arbitrary housing commission action.

Legislative classification by population will be upheld where there is a reasonable relationship between the restriction and population. *Hayes v. Auditor General* (1915), 184 Mich 39; *Kates v. Reading* (1931), 254 Mich 158; *Chamski v. Wayne County Board of Auditors* (1939), 288 Mich 238; *Sullivan v. Graham* (1953), 336 Mich 65. It has been held that the fact that legislation contains a population classification which limits the present application of the act to municipalities over 1,000,000 does not necessarily make the act local or special. *Airport Community Schools v. State Board of Education* (1969), 17 Mich App 574. Equal protection of the laws does not prevent a reasonable classification by legislative enactment and the ultimate decision as to the wisdom

---

[4] See, also, Mich Const 1963, art 4, § 29, as to the constitutional prohibition against special and local acts where a general act can be made applicable. Analyses of special and local legislation and legislation which is violative of the equal protection clause are substantially similar. See *Walters v. Binder* (Ky, 1968), 435 SW2d 464, 466.

of such laws rests with the Legislature. *Tribbett* v. *Village of Marcellus* (1940), 294 Mich 607, 614.

We are unable to say that restriction of the act as expressed in the title of the legislation is arbitrary. The Legislature could reasonably determine that tenants of public housing projects in large cities face considerably different problems than do tenants in smaller cities, such as to warrant classification. For example, tenants in large city public housing projects must compete with a greater number of tenants for individual attention. Tenants of such projects—because they live in the midst of huge urban areas—must cope with not only living in public housing but also living in large cities. Many such distinguishing features exist.

Nor do we think that *Wayne Circuit Judges* v. *Wayne County* (1969), 383 Mich 10, requires a different result. There, legislation established a statewide compensation distribution program for county probation departments, but excepted existing departments in counties with populations of over 500,000. This exception was struck down by the Court as local legislation, principally because the distinction drawn was unreasonable. The Court noted that the function of probation officers is to rehabilitate criminals and since there is a greater need for such work in heavily populated areas, the legislative classification defied logic. Further, the act excepted departments "heretofore established" in counties of 500,000 which narrowed the exception, in effect, to Wayne County.

In the case before us, we see an act limited to large cities and we are of the opinion that many valid reasons may be advanced to justify that limitation. We do not read *Wayne Circuit Judges* as precedent for elevating the rights of small city public housing project tenants on an equal protection basis.

Reversed. No costs, a public question being involved.

O'Hara, J., concurred.

Levin, J. (*concurring in part and dissenting in part*). The question presented is whether the State may constitutionally enact a law granting tenants residing in public housing projects built in the City of Detroit significant rights in respect to their tenancies and their relationship with the Detroit Housing Commission without granting like advantages to tenants residing in public housing projects built in other Michigan localities.

I dissent because, in my opinion, the classification, restricting the operative effect of the law to cities having a population of 1,000,000, or over, violates the following limitation in Michigan's Constitution:

"The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question." Const 1963, art 4, § 29.

The plaintiffs, tenants of a public housing project located in the City of River Rouge (pop. 1970, 15,947), are entitled to the relief granted in *Wayne Circuit Judges* v. *Wayne County* (1969), 383 Mich 10, 32, namely, elimination of the population classification violative of the foregoing constitutional limitation.

Having concluded that this classification by population violates the Michigan constitutional limitation prohibiting local legislation where a general act can be made applicable, I do not reach plaintiffs' alternative contention that the Legislature, in restricting the operative effect of the law of Detroit, denied

them the equal protection of the laws.    US Const,
Am 14; Mich Const 1963, art 1, § 2.

I concur with my colleagues that the act does not
violate the one-object-expressed-in-its-title provi-
sion of Michigan's Constitution.    Const 1963, art 4,
§ 24.[1]

## I.

In 1933 the Legislature enacted the housing and
slum clearance act of 1933 (the act).[2]  Public housing
projects have been constructed in a number of Michi-
gan localities pursuant to the act.    These housing
projects are operated by municipal housing commis-
sions.    The members of a housing commission are
appointed by the chief administrative officer of the
municipality.[3]

In 1968 the Legislature amended the act to grant
to tenants and potential tenants of public housing
projects significant and substantial rights and ad-
vantages not previously spelled out or recognized.
Henceforth, a housing commission is required, under
§ 44b of the amended act, to adopt and promulgate
reasonable rules concerning,

"(a) Eligibility requirements for admission to
housing.

"(b) Obligations of tenants, including regulations
for the use and occupation of housing units and com-
mon areas.

"(c) Just cause for the termination of the right of
use and occupation, so that a tenant may be clearly
apprised of the precise reasons for a termination.

[1] "No law shall embrace more than one object, which shall be
expressed in its title.    No bill shall be altered or amended on its
passage through either house so as to change its original purpose
as determined by its total content and not alone by its title."

[2] PA 1933, Ex Sess, No 18, MCLA § 125.651 *et seq.* (Stat Ann
1971 § 5.3011 *et seq.*).

[3] MCLA § 125.654 (Stat Ann 1971 Cum Supp § 5.3014); but see
fn 10.

"(d) Conditions for continued occupancy, taking account of such factors as family size and changes therein, fluctuations in income, availability of standard accommodations elsewhere, and other relevant matters."[4]

In addition, the 1968 amendatory act creates a board of tenant affairs consisting of not less than 8 nor more than 20 persons. One-half of the members of the board are to be elected from among the tenants occupying housing projects in the locality. The remaining members are to be appointed by the mayor or chief executive with the approval of the legislative body.[5] Broad powers are conferred on the board of tenant affairs:

(a) It shall review and, by a two-thirds affirmative vote of the members of the board, it may veto rules of the housing commission promulgated in accordance with § 44b prior to publication.

(b) The board also has the duty to hear and determine, as a board of review, complaints by a tenant or applicant arising under § 53.

(c) The final determination of the board "on matters heard by way of review" is binding on the housing commission.[6]

---

4 See PA 1968, No 344, adding § 44b to PA 1933, Ex Sess, No 18, MCLA § 125.694b (Stat Ann 1969 Rev § 5.3054[2]).

5 See PA 1968, No 344, adding §§ 49 and 50 to the 1933 Act. MCLA §§ 125.699, 125.700 (Stat Ann 1969 Rev §§ 5.3056[3], 5.3056 [4]).

6 "Sec. 52. (1) The board shall:

"(a) Advise the housing commission on matters concerning the general welfare of the tenants of local projects and facilities.

"(b) Review and may veto rules of the housing commission promulgated in accord with section 44(b) prior to publication.

"(c) Hear and determine, as a board of review, complaints arising under section 53, except that a complainant shall not serve as a member of the board of review in matters relating to his complaint.

"(2) Final determinations reached on matters heard by way of review shall be binding on the local housing commission.

"(3) The power of review and veto shall be exercised by a 2/3 affirmative vote of the members of the board." PA 1968, No 344, adding § 52 to the 1933 Act, MCLA § 125.702 (Stat Ann 1969 Rev § 5.3056[6]).

Under § 53 of the amended act, tenants or applicants have a right to a hearing and review by the board of tenant affairs of a determination denying admission to public housing, terminating a tenant's right of use and occupation, or that "any obligation of a tenant shall be increased or otherwise altered".[7]

It is further provided that, if a decision to terminate a right of use and occupancy is upheld by the board of tenant affairs, an action to regain possession of the tenant's apartment shall not be brought until the tenant's right of use and occupation shall have been terminated by lawful notice. If an action to regain possession is commenced, "the tenant shall have a right to a trial *de novo* on the issue of whether there was just cause to terminate his right of use and occupancy".[8]

It is apparent that important rights and advantages, including a new remedy—a trial *de novo* in a

---

[7] "Sec. 53. (1) The tenant or applicant affected shall have a right to a hearing and review by the board where a determination is made by the project management or by the housing commission:

"(a) That an applicant shall be denied admission to public housing.

"(b) That a tenant's right of use and occupation shall thereafter be terminated.

"(c) That any obligation of a tenant shall be increased or otherwise altered.

"(2) The tenant or applicant shall be given written notice of any determination affecting his status and the reasons therefor, and notice of his right to a hearing. Within 7 days of delivery of the notice, the tenant or occupant may petition the board, in writing, for a hearing and review. Upon such notice, the board shall set a date for the hearing and shall inform the tenant or applicant of the date, time and place of the hearing.

"(3) If the tenant or applicant fails to petition for a hearing within 7 days, he will be held to have waived his right to such hearing but he will not be held to have waived his right to contest the propriety of the commission's action in any later court proceeding.

"(4) The tenant or applicant shall be entitled to a fair hearing before the board and shall have the right to be represented by counsel." PA 1968, No 344, adding § 53 to the 1933 Act, MCLA § 125.703 (Stat Ann 1969 Rev § 5.3056[7]).

[8] PA 1968, No 344, adding § 54 to the 1933 Act, MCLA § 125.704 (Stat Ann 1969 Rev § 5.3056[8]).

court of law on the issue of "just cause" for termi-
nating a tenancy—are conferred by the 1968 amend-
atory act on tenants residing in public housing
projects which were not previously and explicitly
recognized by law.

## II.

While the body of the 1968 amendatory act in
terms applies to any housing commission and pro-
vides that "there is created a board of tenant affairs
for *each* city, village or township having a housing
commission and operating 1 or more housing proj-
ects",[9] (emphasis supplied) the title of the act, as
amended, speaks of the creation of "a board of
tenant affairs in any city of 1,000,000 or over having
a housing commission and operating 1 or more hous-
ing projects".

As previously stated, I agree with my colleagues
that, although the title of the amended act in limiting
the creation of boards of tenant affairs to localities
having a population of 1,000,000 or over is narrower
than the body of the act which contains no such limi-
tation, the act does not violate the one-object-ex-
pressed-in-its-title provision of Michigan's Constitu-
tion.

It is our duty to sustain the constitutionality of
the 1968 amendatory act if we can and, to that end,
the language used should, if possible, be construed to
preserve its constitutionality.    The Legislature
clearly intended to provide for the creation of a
board of tenant affairs in any city of 1,000,000 or
more having a housing commission and operating
one or more housing projects.[10]   It is, therefore, our

---

[9] MCLA §§ 125.694b, 125.699 (Stat Ann 1969 Rev §§ 5.3054[2],
5.3056[3]).

[10] This impression is reinforced by PA 1969, No 327, amending
§ 4 of the act (MCLA § 125.654 [Stat Ann 1971 Cum Supp § 5.3014])

duty to read the population classification into the body of the act.   In *Arnold* v. *Ogle Construction Company* (1952), 333 Mich 652, 663 (cited in the majority opinion), and in other cases[11] the Michigan Supreme Court, when confronted with a claim that the body of a statute exceeded its title, adopted a narrow construction of the statute so that its contents would not exceed its title.

## III.

In one of the first cases to come before the Michigan Supreme Court after the adoption, in the Constitution of 1908, of the constitutional limitation prohibiting the enactment of a local act where a general act can be made applicable,[12] *Attorney General, ex rel. Dingeman,* v. *Lacy* (1914), 180 Mich 329, 337, 338, the Court held that an act creating a domestic relations court in counties having a population of 250,000 or more (then, Wayne County only) violated this constitutional limitation.

The Court reviewed the history of the new constitutional limitation, saying:

"Considering the history of legislation under the Constitution of 1850, it is apparent that there had grown up a pernicious practice on the part of the legislature in passing local acts.  The practice was bad in two very important particulars.  In the first place, much of the legislation thus enacted constituted a direct and unwarranted interference in purely local affairs and an invasion of the principles

---

to enlarge the housing commission in cities of 1,000,000 or more from five to nine members, with two members selected by the board of tenant affairs and two members selected to represent residents of urban renewal areas.

[11] See cases cited in *Maki* v. *City of East Tawas* (1969), 18 Mich App 109, 129, fn 8.

See, also, for 34.

[12] The first sentence of the 1908 provision (Const 1908, art 5, § 30), and the first sentence of the 1963 provision, as quoted at the outset of this opinion, are identical.

of local self-government. In the second place, such legislation affecting as it did certain limited localities in the State, the senators and representatives from unaffected districts were usually complaisant, and agreed to its enactment without the exercise of that intelligence and judgment which all legislation is entitled to receive from all the members of the legislature. This course led to many abuses (principally in amendments to city charters), some of which found their way into the courts, and were there redressed so far as the Constitution then in force would permit.

"With these evils in mind, the Constitution of 1909 [*sic*] was formulated and adopted by the people. From a reading of the provisions above quoted and others of a similar character, it is, we think, entirely clear that it was the settled purpose of the framers of the new instrument and of the people who adopted it to forever insure to the people the right to control their affairs purely local, *and to secure for all general legislation grave attention and the application of the collective wisdom of the legislators.*" (Emphasis supplied.)

Detroit is the only city in Michigan having a population of 1,000,000 or more. The plaintiffs, tenants of a public housing project in a relatively small city, the City of River Rouge, commenced this action claiming that they too are entitled to the substantial rights and advantages granted by this legislation to tenants residing in public housing projects operated by Detroit's housing commission.

It is entirely true, as the majority points out, that our Supreme Court has sustained legislation classifying by population against the challenge that it is violative of the Michigan constitutional limitation prohibiting passage of a local act where a general act can be made applicable.[13] It would, however,

---

13 See cases cited in fns 21 and 22.

be a misreading of those cases to conclude that classification by population is inevitably consistent with the constitutional limitation. In a number of cases the Supreme Court has rejected population classifications as violative of the constitutional prohibition against enactment of a local act where a general act can be made applicable.[14]

The majority declares that "the legislature could reasonably determine that tenants of public housing projects in larger cities face considerably different problems than do tenants in smaller cities, such as to warrant classification. For example, tenants in large city public housing projects must compete with a greater number of tenants for individual attention. Tenants of such projects—because they live in the midst of huge urban areas—must cope with not only living in public housing but also living in large cities. Many such distinguishing features exist."

If differences in size or profile of communities were always a reasonable basis of classification, then a means has been found for obliterating altogether the constitutional prohibition against passage of a local act where a general act can be made applicable. There are always "distinguishing features" between the problems faced by persons residing in a small city and in a large one. Bigness always creates problems. If the majority's reasoning is adopted, population would be a proper basis of classification in almost every conceivable case; it is not (see cases cited in fn 14).

The Legislature may, indeed, properly legislate concerning a problem which exists in only one com-

---

[14] See *Attorney General, ex rel. Dingeman*, v. *Lacy* (1914), 180 Mich 329; *Monroe* v. *Judge of Police Court of Grand Rapids* (1945), 311 Mich 76, discussed in the main text of this opinion; *Klosinski* v. *Michigan State Board of Examiners of Barbers* (1944), 308 Mich 70, discussed in fn 22; and cases cited and discussed in fn 19.

munity. If it appears that the dividing line between
the existence or nonexistence of a problem can be
accurately stated in terms of population size, then
the Legislature may properly make the applicability
of the legislation depend on a population standard.[15]
While the Legislature must be given some leeway in
drawing the line, the question whether the problem
exists in only one community, the question of
whether a general act can be made applicable, is,
under our Constitution, a "judicial question", not a
legislative one. We are obliged to scrutinize the
legislative determination and ourselves decide
whether the problem is of a kind which exists only in
one community or only in communities of a specified
population.

The majority decides that judicial question in
favor of the City of River Rouge without any record
evidence establishing its claim that the problems
facing tenants residing in its projects are sufficiently
different from those of tenants residing in Detroit
projects so that the 1968 amendatory act, granting
significant rights to tenants residing in Detroit proj-
ects, cannot be made applicable to tenants residing
in River Rouge projects.

The Michigan Supreme Court has declared:

"A valid classification in a general law must be

[15] Most, perhaps all, acts classifying by population which have
been held constitutional (see fns 21 and 22 for citations) have
been held valid as general acts, not as local acts adopted with the
requisite vote of the Legislature and of the voters. See fn 29 and
accompanying text.

Whether an act is a local or a general act is of no decisional im-
portance in this case. The relief I would grant the plaintiffs is the
elimination of the population classification. Granting such relief
would clearly make the act a general act not requiring a referendum.

Cases sustaining acts as local acts include *Huron-Clinton Metro-
politan Authority* v. *Boards of Supervisors of Five Counties* (1941),
300 Mich 1, 12, 13, and *Common Council of the City of Detroit* v.
*Engel* (1918), 202 Mich 544, 552.

based upon some *real* difference or distinction."
(Emphasis supplied.)[16]

There is not a scintilla of evidence that there is
any "real difference or distinction" between the
problems of an impoverished tenant residing in a
public housing project who has to deal with a hous-
ing commission bureaucracy based on whether he
resides in River Rouge or Detroit. Indeed, it may
appear on a complete record that the government
of Detroit through its housing commission is as
responsive, perhaps even more responsive, to the
needs of tenants and prospective tenants of public
housing projects than the government of the City
of River Rouge. In all events, it is an unproven
assumption—a theory, not an established fact—that
the problems faced by residents of public housing
projects in Detroit are significantly different from
those faced by persons residing in a River Rouge
public housing project.

It may be argued that a presumption of validity
attaches to legislative acts and that a person who
challenges the constitutionality of an act has the
burden of proof. Conceding that general proposi-
tion to be sound, an act which confers significant
*legal rights* and which on its face, by reason of a
population classification of 1,000,000 or over, does
not now and is not likely within the foreseeable
future to apply except in one city in Michigan is
not entitled to the benefit of that presumption
where the challenge is that it is a local act and that
a general act could have been made applicable. The
burden of negativing every conceivable hypothesis

16 *Attorney General* v. *Connolly* (1916), 193 Mich 499, 514. An
act provided pensions for teachers statewise but excepted those dis-
tricts already providing pensions for schoolteachers (only Detroit).
The act also provided a means for merging a local fund into the
State fund. The act was held valid as a general law.

that this or some other court at the trial or appellate level might conjure up to justify legislative classification by population cannot properly be imposed on one who challenges such a questionable classification.[17] To permit vague hypotheses to substitute for proof would thwart the constitutionally-required "judicial determination".

---

[17] There has been increasing recognition that all classifications are not presumptively valid; that, indeed, the state has the burden of justifying some classifications.

In the application of the equal protection clause, the United States Supreme Court has declared that the "any rational basis for the discrimination" analysis, utilized in appraising economic regulation legislation, does not circumscribe the inquiry where the discrimination concerns a suspect classification and that in such a case the burden, a "very heavy burden of justification", must be carried by a state contending that the legislation is valid. *Loving* v. *Virginia* (1967), 388 US 1, 8, 9 (87 S Ct 1817, 1821, 1822; 18 L Ed 2d 1010, 1015, 1016) (statute prohibiting a white person from marrying any person other than a white person is invalid). Similarly, see *Skinner* v. *Oklahoma* (1942), 316 US 535, 541 (62 S Ct 1110, 1113; 86 L Ed 1655, 1660) (statute providing for sterilization of habitual criminals held invalid; "strict scrutiny" of the classification in a sterilization law is essential); *Korematsu* v. *United States* (1944), 323 US 214, 216 (65 S Ct 193, 194; 89 L Ed 194, 199) (exclusion of citizens of Japanese extraction from certain areas of the west coast at the beginning of the war with Japan held to have been a valid exercise of the war power; but the Court observed: "All legal restrictions which curtail the civil rights of a single racial group are immediately suspect. * * * [The] courts must subject them to the most rigid scrutiny."); *Harper* v. *Virginia State Board of Elections* (1966), 383 US 663, 670 (86 S Ct 1079, 1083; 16 L Ed 2d 169, 174) (poll tax held invalid; "Where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined".); *Williams* v. *Rhodes* (1968), 393 US 23, 31 (89 S Ct 5, 11; 21 L Ed 2d 24, 32) (voting rights); *Shapiro* v. *Thompson* (1969), 394 US 618, 634, 638 (89 S Ct 1322, 1331, 1333; 22 L Ed 2d 600, 615, 617) (right to travel from state to state; welfare benefits residency requirement); *Graham* v. *Richardson* (1971), 403 US 365 (91 S Ct 1848, 29 L Ed 2d 534) (residency requirement for aliens seeking welfare benefits).

But see *Dandridge* v. *Williams* (1970), 397 US 471 (90 S Ct 1153, 25 L Ed 2d 491), *reh den* 398 US 914 (90 S Ct 1684, 26 L Ed 2d 80), holding that the traditional standard developed in cases concerning the regulation of business or industry applies "in the area of economics and social welfare" and that that standard would be applied in testing the validity of a regulation placing an absolute limit of $250 per month on the amount of a grant under a welfare program regardless of the size of the family and its actual needs.

## IV.

The Michigan Supreme Court has, indeed, declared that classification by population is permissible where it has a "reasonable relation" to the purpose of the act.[18] Loosely applied, the "reasonable relation" test could undermine, rather than enforce, the constitutional mandate that no local act shall be passed where a general act can be made applicable. In this connection, the Supreme Court once observed, "A laudable purpose does not validate unconstitutional means".[19] While the courts

---

[18] *City of Dearborn* v. *Wayne County Board of Supervisors* (1936), 275 Mich 151, 115; *Mulloy* v. *Wayne County Board of Supervisors* (1929), 246 Mich 632, 635; *Holland* v. *Adams* (1934), 269 Mich 371, 375.

[19] See *City of Dearborn* v. *Wayne County Board of Supervisors* (1936), 275 Mich 151, 158; the act concerned the representation of cities upon boards of supervisors of counties in which there are 75 or more city members. Although Wayne County was the only county at the time with 75 or more city members, since the statute would permit application to any county which would come within the class in the future it was not invalid as a local law on that account. However, it was invalid because of a proviso establishing representation of cities with population of 500,000 or more (then Detroit) at 57% of the total city membership because of the impossibility of two cities of 500,000 or more population in the same county having such representation and because "the absolute standard imports a local act, based upon things as they are, and may be held reasonable only in a present, known situation. It is repugnant to the theory of a general law which operates upon things as they may be in the future." (p 158.)

Other cases holding acts to be violative of the constitutional limitation include the following: *Common Council of the City of Detroit* v. *Engel* (1918), 202 Mich 536, holding that an act raising the authorized rate of interest to be paid on school bonds issued by the City of Detroit from 4% to 6% is a local act because a general act fixing the maximum rate of interest for school bonds for all school districts can be made applicable. The Court quoted from the official address issued by the Constitutional Convention to the people as follows (p 543):

"It is intended to eliminate the vast volume of local legislation which has burdened the legislature in recent years and in many instances brought discredit upon it. * * * It will not only relieve the legislature, but it will also remove one of the greatest sources of evil in modern legislative bodies."

*Attorney General, ex rel. McRae,* v. *Thompson* (1912), 168 Mich 511, 517, holding that an act amending the charter of the City of Detroit by extending the limit of municipal indebtedness from 2%

are *"more inclined* to uphold the act where there is
a reasonable relationship between the restriction
and the population"[20] (emphasis supplied), the ex-
istence of such a relationship cannot end the inquiry
—even if there is such a relationship the statute is,
nevertheless, invalid if a "general act can be made
applicable". The "reasonable relation" rationale
may be an adequate explanation of some cases; it
cannot constitutionally override the constitutional
standard.

An analysis of decisions of the Michigan Supreme
Court in cases where legislation classifying by
population was challenged on the ground that it
violates the prohibition against passage of a local
act where a general act can be made applicable,
indicates that legislation of this kind can be func-
tionally classified into three broad categories: (a)
legislation concerning governmental operations and
functions,[21] (b) legislation providing for economic

---

to 3% of the assessed valuation is invalid because a general act
could be made applicable.

Other cases holding acts invalid include *Mulloy* v. *Wayne County
Board of Supervisors, supra*, p 639, and *Wayne County Board of
Review* v. *Great Lakes Steel Corporation* (1937), 300 US 29 (57 S Ct
329, 81 L Ed 485) (affirming a decision of a three-judge court
reported at 12 F Supp 55).

[20] *Sullivan* v. *Graham* (1953), 336 Mich 65, 69.

[21] *Hayes* v. *Auditor General* (1915), 184 Mich 39 (act authorizing
greater compensation to county agents in counties having a popu-
lation in excess of 150,000 [then Wayne and Kent]; held classification
valid because of higher case load and living cost in more populous
counties); *Kates* v. *Reading* (1931), 254 Mich 158 (act consolidat-
ing courts of justices of the peace of prescribed population [Detroit]
into one court of common pleas; held Detroit alone had six justices
of the peace functioning independently of each other, each individ-
ually responsible for all matters in relation to suits commenced before
him and, hence, presented problems of coordination attributable to
the size of Detroit requiring consolidation and justifying a popu-
lation classification; the powers and duties of the judges and the
jurisdiction, practice, and procedure and, thus, the rights of litigants
were unaffected); *Chamski* v. *Wayne County Board of Auditors*
(1939), 288 Mich 238 (the Constitution authorizes the Legislature
to provide by law for more than one judge of probate in counties
of more than 100,000 inhabitants; a law authorizing the judges of
a probate court having four judges to choose their presiding judge

regulation of business,[22] and (c) legislation establishing or concerning individual rights and preroga-

is valid even though a different method of selection obtains in probate courts having two or three judges); *Tribbett* v. *Village of Marcellus* (1940), 294 Mich 607 (act authorizing disconnection of land from cities but not incorporated villages of less than 500 population and from villages and not cities of more than 7,000 population is valid); *Airport Community Schools* v. *State Board of Education* (1969), 17 Mich App 574 (act concerning emeregncy reorganization of primary and fourth class school districts not maintaining high schools in a county of more than 1,000,000 population [Wayne County] is valid).

Similarly, *Attorney General, ex rel. Eaves,* v. *State Bridge Commission* (1936), 277 Mich 373 (act authorizing State Bridge Commission to build an international bridge across the St. Clair River at or near Port Huron; held the act is for the benefit of everyone in the state and is not local merely because its American approach is in a particular city in Michigan); *People* v. *Brazee* (1914), 183 Mich 259, 267 (an act requiring licensing of private employment agencies not invalid, although a fee of $25 is charged in all cities except those having a population of over 200,000 [Detroit] where the fee is $100; the Court declared: "It may well be that the Legislature appreciated the fact that inspection for the purpose of proper regulation in large cities would be much more expensive than such inspection in smaller cities, and that the larger sum was fixed for the purpose of meeting such added expense of administration".); *Matthews* v. *Montgomery* (1936), 275 Mich 141, 145 (a statute delegating to the board of supervisors of counties containing 12 or more surveyed townships the power to appoint county road commissioners is not a local law requiring a referendum; the plaintiff had not "alleged nor shown that any county in the State has less than 12 surveyed townships. Moreover, it is evident that the number of townships in the county affords a basis of classification for legislation pertaining to highways".); *Burton* v. *Koch* (1915), 184 Mich 250, 255 (an act providing that in districts co-extensive with a city having 250,000 inhabitants or more [then Detroit], the Board of Education shall consist of seven members elected by the voters of the entire district is a general act).

Also holding acts valid, see *Holland* v. *Adams* (1934), 269 Mich 371; *Doyle* v. *Election Commission of the City of Detroit* (1933), 261 Mich 546, 550.

But see cases cited in fn 19.

[22] *Sullivan* v. *Graham* (1953), 336 Mich 65 (act regulating and requiring the licensing of residential builders and residential maintenance and alteration contractors in counties having a population of 250,000 or more [then Wayne and three other counties], held not invalid as a local or special act); *The Irishman's Lot, Inc.,* v. *Secretary of State* (1954), 338 Mich 662, 668 (an act prohibiting dealing in automobiles on Sunday in counties having a population of 130,000 or over is valid as a general act. The Court declared: "In the case at bar the classification presently applies to the 8 counties where 41% of the dealers are located, most of the sales are made, and competition keenest, and in the wisdom of the legislature needed regulation.").

tives. The cases relied on in the majority opinion all concern legislation in the first two categories— (a) governmental operations and functions and (b) economic regulation of business.[23]

There is an understandable tendency in the cases to recognize the right of the Legislature to pass laws concerning governmental operations and functions that are to be applicable only in communities of a particular size.[24] Obviously, the governance of Detroit requires a format entirely different from that required to govern a small village. Clearly, a governmental superstructure of the kind needed to govern Detroit would be excessive for most communities.

Similarly, it may become necessary to regulate certain kinds of business when operating in a large community while there is no need to provide regulation of such businesses in a smaller community. That in such a case the Legislature is not obliged to make the regulatory act applicable throughout the state has also been recognized.[25]

However, where individual rights are involved, the needs of the citizen are less likely to vary significantly from one community to another. Thus,

But see *Klosinski v. Michigan State Board of Examiners of Barbers* (1944), 308 Mich 70, 74, 75, holding that a statute regulating service charges and hours of operation of barbershops in counties having a population of 500,000 or more could not be sustained as a general law because it appeared from the undisputed testimony "that the test of whether the regulations sought to be imposed are necessary or proper has no reasonable or logical relation to a county's population being more or less than 500,000". The act was also invalid because it could never become applicable in another county because the population was to be determined "according to the last Federal census".

[23] The first five cases discussed in fn 21 and the first case discussed in fn 22 are the cases cited in the majority opinion concerning challenges based on Const 1963, art 4, § 29 and its predecessor, Const 1908, art 5, § 30.

[24] See cases cited in fn 21.

[25] See cases cited in fn 22.

in *Monroe* v. *Judge of Police Court of Grand Rapids*
(1945), 311 Mich 76, 83, the Michigan Supreme Court
held violative of the prohibition against passing a
local act where a general act can be made applicable,
a statutory provision eliminating the right of appeal
from justice courts to circuit court in cases where
the defendant was convicted upon a plea of guilty
in a police court (which performed the function of
the justice court) in a city having a population of
between 100,000 and 200,000 (at the time, Grand
Rapids). The Supreme Court rejected arguments
that the classification should be sustained because
the judges of the Grand Rapids Police Court were
required to be lawyers, in contrast with justices
of the peace, and because of the large volume of
criminal cases in Grand Rapids, far exceeding those
coming before a justice of the peace in a township.
The Court declared:

"We are not well impressed that the foregoing or
other circumstances noted disclose a *just basis* of
classification such as would sustain the provision
under consideration as a valid provision in a gen-
eral legislative act. We are unable to see any dis-
tinction between the *needs incident to this phase of
the law* in cities having a population between 100,000
and 200,000 and other cities having a population
slightly less than 100,000 or more than 200,000.
\* \* \*   It follows that Mrs. Monroe's right of
appeal was not affected by the statutory provision
just quoted." (Emphasis supplied.)

Although the classification might have been sus-
tained on the basis that it concerned the governance
of communities of a particular size, the Court pre-
ferred to focus on the rights of the individual, Mrs.
Monroe, which were at stake. The mechanical dif-
ferences in governing townships and in governing
cities of the size of Grand Rapids did not justify

depriving residents of Grand Rapids of a legal right enjoyed by persons residing elsewhere.

Similarly, in *Attorney General, ex rel. Dingeman, v. Lacy, supra,* p 341, where the Supreme Court invalidated an act creating a domestic relations court[26] in counties having a population of 250,000 or more (then, Wayne County only), the Court declared:

"The domestic relations of the inhabitants of the counties of Wayne, Jackson, or Ogemaw are essentially the same. The same problems touching these relations are presented in every community, though with a frequency varying with the population. There is no reason, founded in logic, why the residents of Wayne County should be subjected to regulations in their domestic relations which are not applicable to residents in all other parts of the State."[27]

As the Supreme Court later observed in commenting on this decision, the "city of Detroit presented no problems of domestic relations, except frequency, different from other communities". *Kates* v. *Reading* (1931), 254 Mich 158, 165.

Focusing on the presented constitutional question in terms of the needs and statutory rights of public housing tenants, it has not been shown that there is any justification for the classification which has been drawn.[28] The problems facing tenants resid-

[26] The judge of the domestic relations court would, by virtue of his office, have become a circuit judge. The jurisdiction of the court included the power to hear, try, and determine all actions for divorce or annulment of marriage and all actions to compel the support of illegitimate children, and criminal cases where the crime charged concerned violation of the laws compelling the support of a wife and minor children, forbidding desertion, abandonment, contributing to the delinquency of and cruelty to children.

[27] The Court also found the act establishing a domestic relations court to be violative of other constitutional provisions.

[28] The Legislature may, of course, recognize in a general law real differences so as to preserve to all with reasonable similitude the

ing in Detroit public housing projects and the problems facing persons residing in a River Rouge public housing project are, at least as far as this record shows, essentially the same.

It may be contended that the board of tenant affairs was created to assist in the management of the large number of public housing projects in Detroit and, thus, the population classification should be sustained as a law concerning the governance of Detroit or as an economic regulation of the business of renting public housing. There is, however, no evidence whatsoever that the impetus for this legislation was to facilitate government functioning or to regulate a business or that, if it was, there is less need for such legislation in River Rouge or countless other communities operating public housing projects.

A reading of the act leaves one with the definite impression that the real impetus for this legislation was not to facilitate management nor to regulate a business but to enlarge and create new rights in public housing tenants.

## V.

Under the Constitution a local act can only be adopted upon the affirmative vote of two-thirds of the members of the Legislature and a majority of the electors voting on the question in the district affected.[29]

Every act which is applicable in one or more, but not every, locality in the state is in a sense a local

---

right being granted. Thus, in *Schurgin* v. *Bankers Trust Co. of Detroit* (1939), 289 Mich 70, 73, the Court held valid as a general law a mortgage moratorium act which defined a homestead as a dwelling and not to exceed 160 acres where situated outside of a city or village and as a dwelling located on not to exceed 4 lots where situated in any city, village or recorded plat.

[29] Const 1963, art 4, § 29.

act. However, as the majority points out, acts classifying by population (which, accordingly, do not apply in all localities of the state) have been sustained as general acts,[30] thereby dispensing with the need for passage by a two-thirds vote of the Legislature and a referendum of the voters.

When an act classifying by population, and thus applicable in less than the entire state, is sustained as a general act the court says, in effect, that the act could not have been made more generally applicable.

In *Wayne Circuit Judges* v. *Wayne County* (1969), 383 Mich 10, the Michigan Supreme Court held that an act authorizing the corrections commission to make service grants to counties unable adequately to maintain their probation programs, except counties having a population over 500,000 (then, Wayne), was unconstitutional "as an invalid classification constituting local legislation in violation of Const 1963, art 4, § 29". (p 31.) The Supreme Court, however, sustained the act as a general act by eliminating the population classification. The Court declared:

"The invalidity of § 26 [where the population classification was set forth] does not by reason of MCLA § 8.5 (Stat Ann 1969 Rev § 2.216) affect the balance of the act." (p 32.)

Whether the absence of constitutionally-required generality consists of the exclusion of Wayne County (*Wayne Circuit Judges* v. *Wayne County*) or the exclusion of all the state except Detroit (this case of *Bankhead* v. *Mayor of River Rouge*) does not change the essence of the matter.[31] Here as in

---

[30] See fn 15.

[31] Although in *Wayne Circuit Judges* approximately two-thirds of the state's population resided in the advantaged district (the entire

*Wayne Circuit Judges,* advantages conferred by
state law on citizens residing in a favored locale
have been denied to citizens residing elsewhere and
the law conferring the advantages could have been
made more general, totally general in its applica-
tion. As in *Wayne Circuit Judges,* meaningful relief
can only be granted by a declaration eliminating
the unconstitutional population classification.[32]

To declare the challenged act invalid in its en-
tirety as a local act would tend to insulate acts of
this kind from effective challenge by persons resid-
ing outside the benefited district; those challenging
the act would appear as dogs in the manger, willing
to deprive citizens residing in the benefited district
of advantages which, even if the challenge is suc-

---

state less Wayne County) and here 17% of the state's population
resides in the advantaged district (Detroit), over 40% of the public
housing units operated by public housing commissions pursuant to
the act are located in Detroit. Thus, here, as in *Wayne Circuit
Judges,* looking at the relevant population (taxpayers in *Wayne Cir-
cuit Judges;* public housing tenants in this case) the advantaged
group represents a substantial portion of the relevant population.

[32] Until *Wayne Circuit Judges* was decided, whenever an act was
found violative of the constitutional limitation, it was held invalid
in its entirety. See cases cited in fns 19 and 22. Those cases were,
however, all decided before PA 1945, No 119 (MCLA § 8.5 [Stat
Ann 1969 Rev § 2.216]), relied on in *Wayne Circuit Judges,* was
adopted adding to the provisions of law concerning the construction
of statutes a severability savings clause. Also, the trend of con-
stitutional litigation favors preserving the constitutionality of leg-
islation, and the extension of benefits that have been conferred on
a favored group to those not advantaged rather than elimination of
the advantage altogether. See *Warren* v. *Parole Board* (1970), 23
Mich App 754; *Fox* v. *Employment Security Commission* (1967), 379
Mich 579.

There may be cases where, after considering the nature of the
legislation and other relevant factors, a court might correctly con-
clude that it would not be prudent or appropriate to preserve an
invalid act by eliminating a population classification and that the
proper remedy is a declaration that the act is completely invalid.
*Cf. Klosinski* v. *Michigan State Board of Examiners of Barbers, supra,*
fn 22. But in a case such as this, where the Legislature has conferred
significant benefits on a substantial portion of the persons in the
relevant population (see fn 31), it would work great injustice to
declare the law invalid because the advantages had not been con-
ferred on the rest of the relevant population—the more appropriate
disposition is to extend the advantage to all in the class.

cessful, the challenger cannot obtain.  Legislators
could vote for legislation which, although it could
be made general, affects an area which they do not
represent, secure in the knowledge that if the act
is challenged all that will happen is the removal
of the act from the books; that their districts would
not be affected by the court challenge.  The disposi-
tion of this case which will enforce the constitutional
limitation, which will "secure for all general legisla-
tion grave attention and the application of the col-
lective wisdom of the legislators",[33] is that adopted
in *Wayne Circuit Judges,* namely elimination of
the unconstitutional population classification and
preservation of the balance of the act.[34]

Eliminating the illegal population classification
does not deprive persons residing in the benefited
district who may oppose the legislation of a con-
stitutional right, the right to a referendum.  There

---

[33] *Attorney General, ex rel. Dingeman,* v. *Lacy, supra,* p 338.

[34] Similarly, even though the title of the act did not forewarn
legislators and citizens that the act might apply outside Detroit, to
prevent avoidance of the prohibition against adoption of a local act
where a general act could be made applicable the present law should
be deemed applicable generally throughout the state.  Although a
purpose of the one-object-expressed-in-its-title requirement may not
have been fully implemented, any other rule would make it possible
for the Legislature to enact local acts conferring advantages on
persons residing in a particular locality not granted persons residing
elsewhere violative of the constitutional limitation on local acts, se-
cure in the knowledge that those most likely to challenge the act
(persons residing outside the favored district) would have nothing
to gain by doing so because of the population limitation in the title
and the apparent violation of the one-object-expressed-in-its-title
provision.

Where two constitutional policies meet head-on the courts must
reconcile them as best they can.  I am convinced that there is
considerably more danger that the prohibition against passage of a
local act where a general act could be made applicable would be
avoided by inclusion of a population classification in the title of an
act than there is that members of the Legislature or interested cit-
izens will be misled by the inclusion of a population classification in
the title; if the course which I advocate is followed, the Legislature
and lawyers representing municipalities, who watch pending legis-
lation, would know that the courts will not allow the constitutional
limitation on local acts to be avoided by insertion of a population
classification in the title.

is no right to a referendum except as to local acts and, under the constitution, a local act cannot be passed where a general act can be made applicable. The operative effect of an act can only be extended outside the district when a court decides that the act could and, therefore, should have been enacted, if at all, as a general act; such an act, if extended outside the benefited district to effect the constitutionally-required generality would become a general act. Since the act could not be validly enacted as a local act and as extended, is a general act, there never was a right to a referendum.